IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Azam Rahimi; | § | |
| STATE OF CALIFORNIA, *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF COLORADO *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF CONNECTICUT *ex rel*. | § | CIVIL NO: _____ |
| Azam Rahimi; | § | |
| STATE OF DELAWARE, *ex rel.* | § | |
| Azam Rahimi; | § | |
| DISTRICT OF COLUMBIA *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF FLORIDA *ex rel*. | § | FILED UNDER SEAL |
| Azam Rahimi; | § | |
| STATE OF GEORGIA *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF HAWAII *ex rel.* | § | |
| Azam Rahimi; | § | RELATOR AZAM RAHIMI'S |
| STATE OF ILLINOIS *ex rel.* | § | ORIGINAL COMPLAINT FILED |
| Azam Rahimi; | § | PURSUANT TO 31 U.S.C. |
| STATE OF INDIANA *ex rel.* | § | §§ 3729 - 3723 FEDERAL |
| Azam Rahimi; | § | FALSE CLAIMS ACT AND STATES' |
| STATE OF IOWA *ex rel.* | § | FALSE CLAIMS ACTS AND |
| Azam Rahimi; | § | PENDENT CLAIMS |
| STATE OF LOUISIANA *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF MARYLAND *ex rel.* | § | |
| Azam Rahimi; | § | |
| COMMONWEALTH OF MASSACHUSETTS | § | |
| *ex rel.* Azam Rahimi; | § | |
| STATE OF MICHIGAN *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF MINNESOTA *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF MONTANA *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF NEVADA *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF NEW HAMPSHIRE *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF NEW JERSEY *ex rel.* | § | |
| Azam Rahimi; | § | |
| STATE OF NEW MEXICO *ex rel.* | § | |

Azam Rahimi;                                    §
STATE OF NEW YORK *ex rel.*                      §
Azam Rahimi;                                    §
STATE OF NORTH CAROLINA *ex rel.*                §
Azam Rahimi;                                    §
STATE OF OKLAHOMA *ex rel.*                      §
Azam Rahimi;                                    §
STATE OF RHODE ISLAND *ex rel.*                  §
Azam Rahimi;                                    §
STATE OF TENNESSEE *ex rel.*                     §
Azam Rahimi;                                    §
STATE OF VERMONT *ex rel.*                       §
Azam Rahimi;                                    §        JURY TRIAL DEMANDED
STATE OF WASHINGTON *ex rel.*                    §
Azam Rahimi;                                    §
COMMONWEALTH OF VIRGINIA *ex rel.*               §
Azam Rahimi; and                                §
Doe States 1 – 21 *ex rel.*                      §
Azam Rahimi                                     §
                                                §
        Plaintiffs,                             §
                                                §
v.                                              §
                                                §
Amphastar Pharmaceuticals, Inc., Actavis, Inc., §
Sandoz, Inc., Teva Pharmaceuticals USA, Inc.,   §
Winthrop U.S., and Sanofi-Aventis U.S. LLC      §


**<u>RELATOR AZAM RAHIMI'S ORIGINAL COMPLAINT</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     INTRODUCTION TO GOVERNMENT PLAINTIFFS .................................................. 3

III.    PARTIES ................................................................................... 4

        A.      Relator ............................................................................. 4

        B.      Defendants .......................................................................... 4

        C.      Respondeat Superior and Vicarious Liability ......................................... 6

IV.     JURISDICTION AND VENUE ................................................................... 7

V.      MEDICAID REIMBURSEMENT FOR GENERIC DRUGS ................................................ 8

        A.      Overview of the Medicaid Program ................................................... 8

        B.      Medicaid Drug Reimbursement ........................................................ 9

                1.      National Drug Codes ........................................................ 9

                2.      Medicaid Reimbursement Formulas ........................................... 12

VI.     MEDICARE PART D .......................................................................... 15

VII.    TRICARE, CHAMPVA AND FEHBP REIMBURSEMENT ................................................ 16

VIII.   RELATOR'S DISCOVERY OF DEFENDANTS' FRAUDULENT PRICING
        SCHEMES .................................................................................. 17

IX.     DEFENDANTS' FRAUDULENT PRICING .......................................................... 19

        A.      Fraudulent Reporting of Prices ..................................................... 19

        B.      Pricing of Enoxaparin .............................................................. 20

                1.      AWP Spreads and Spread Percentages ........................................ *20*

                2.      Specific Patient Claims ................................................... *25*

i

X.     ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE
       CLAIMS ACT…………………………………………………………………...26

       A.     Applicable Law ...................................................................................26

              1.     The False Claims Act ................................................................ 26

              2.     The Federal Anti-Kickback Statute ......................................... 28

       B.     Defendants' Violations of the FCA .....................................................31

              1.     Presentation of False Claims (31 U.S.C. § 3729(a)(1);  31 U.S.C. §
                     3729(a)(1)(A)).......................................................................... 31

              2.     Making or Using False Records or Statements to Cause a Claim to be Paid
                     (31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))............................. 32

              3.     Conspiracy to Defraud the Government In Violation of the FCA (31
                     U.S.C. § 3729(a)(3); 31 U.S.C. 3729(a)(1)(C)) ....................................... 44

XI.    CAUSES OF ACTION ...................................................................... 45

       A.     Count  I – False  Claims  (31  U.S.C.  §  3729(a);  31  U.S.C.  §
              3729(a)(1)(A))...........................................................................................45

       B.     Count  II – False  Records  or  Statements  (31  U.S.C.  §  3729(a);  31
              U.S.C. § 3729(a)(1)(B)) ...........................................................................46

       C.     Count  III – Conspiracy  to  defraud  Government  (31  U.S.C.  §
              3729(a)(3); 31 U.S.C. 3729(a)(1)(C))....................................................47

       D.     Count IV – California False Claims Act...................................................49

       E.     Count V – Colorado Medicaid False Claims Act ...................................52

       F.     Count VI – Connecticut False Claims Act...............................................54

       G.     Count VII - Delaware False Claims and Reporting Act .......................57

       H.     Count VIII – District of Columbia False Claims Act ...........................60

I.      Count IX – Florida False Claims Act ....................................................63

J.      Count X – Georgia False Medicaid Claims Act ...................................65

K.      Count XI – Hawaii False Claims Act ...................................................68

L.      Count XII – Illinois False Claims Act .................................................71

M.      Count XIII – Indiana Medicaid False Claims and Whistleblower
        Protection Act .....................................................................................74

N.      Count XIV – Iowa False Claims Act ...................................................77

O.      Count XV – Louisiana Medical Assistance Programs Integrity Law...................79

P.      Count XVI – Maryland False Claims Act.............................................82

Q.      Count XVII – Massachusetts False Claims Act....................................85

R.      Count XVIII – Michigan Medicaid False Claim Act.............................88

S.      Count XIX – Minnesota False Claims Act ...........................................91

T.      Count XX – Montana False Claims Act ...............................................93

U.      Count XXI – Nevada False Claims Act ................................................96

V.      Count XXII – New Hampshire Medicaid Fraud and False Claims
        Act.........................................................................................................99

W.      Count XXIII – New Jersey False Claims Act.......................................102

X.      Count XXIV – New Mexico Medicaid False Claims Act ...................104

Y.      Count XXV – New York False Claims Act..........................................108

Z.      Count XXVI – North Carolina False Claims Act ................................111

AA.     Count XXVII – Oklahoma Medicaid False Claims Act ......................114

BB.     Count XXVIII – Rhode Island State False Claims Act .......................116

CC.     Count XXIX – Tennessee Medicaid False Claims Act .......................119

    DD.    Count XXX – Vermont False Claims Act ............................................................122

    EE.    Count XXXI – Virginia Fraud Against Taxpayers Act .......................................125

    FF.    Count XXXII – Washington State Medicaid Fraud False Claims Act ...............128

    GG.    Count XXXIII – Common Fund Relief ..............................................................131

XII.    SIZE OF RECOVERY ...................................................................................... 132

XIII.    DOCUMENTARY EVIDENCE ...................................................................... 132

XIV.    DEMAND FOR JURY TRIAL ........................................................................ 133

1.      On behalf of the United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Vermont, and Washington, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and on his own behalf, Plaintiff/Relator Azam Rahimi brings this action pursuant to 31 U.S.C. §3729-3723 ("False Claims Act") against Defendants Amphastar Pharmaceuticals, Inc.; Actavis, Inc.; Sandoz, Inc.; Teva Pharmaceuticals USA, Inc.; Winthrop U.S.; and Sanofi-Aventis U.S., LLC (collectively, the "Defendants").

2.      Relator seeks to recover all damages, penalties, and other remedies established by the Federal False Claims Act and the various state false claims acts on behalf of the United States, the States, and himself. Relator voluntarily submitted a pre-filing disclosure statement and referenced exhibits to the Government Plaintiffs on November 4, 2015. Relator is serving an Original Disclosure Statement and referenced exhibits simultaneously with the filing of this Original Complaint. Relator would respectfully show the following:

## I.    INTRODUCTION

3.      This suit concerns Defendants' fraudulent inflation of the prices for the drug Enoxaparin.  Enoxaparin is the generic for Lovenox, which is an injectable product indicated to treat deep vein thrombosis. The Food and Drug Administration (FDA) approved the first generic for Lovenox on July 23, 2010.

4.      Defendants are manufacturers of Enoxaparin. The Defendants report to various drug price publishers the amounts that they supposedly charge for Enoxaparin.  The price publishers use this information to publish pricing compendia.  The Government in turn relies on this published pricing information to determine the rate at which it will reimburse retail

pharmacies for filling Enoxaparin prescriptions for individuals enrolled in public health care programs, including Medicaid.

5.     Retail pharmacies purchase Enoxaparin from Defendants either directly or through a wholesaler and then dispense the drug to patients covered by Medicaid and other public health care programs.  After dispensing Enoxaparin, retail pharmacies submit claims to the Government for reimbursement.  Retail pharmacies profit from the pricing spread or the difference between the price at which the pharmacies purchased Enoxaparin from Defendants and the amount they are reimbursed by public health care programs.

6.     Defendants' fraudulent actions proceeded as follows. First, Defendants reported to the pricing compendia inflated prices for Enoxaparin, knowing Medicaid would use those prices to set the rate at which the Government reimburses retail pharmacies for filling Enoxaparin prescriptions for individuals enrolled in public health care programs.  Defendants' actual sales prices are far lower than the prices reported by Defendants.  Second, Defendants sell Enoxaparin to wholesalers and retail pharmacy customers at prices that are dramatically lower than the prices they report to pricing compendia.  Third, Defendants use the "pricing spread" or the difference between the fraudulently inflated prices reported to the pricing compendia and the dramatically lower prices their retail pharmacy customers paid to induce the retail pharmacies to purchase Enoxaparin from Defendants.  Specifically, by knowingly reporting fraudulently inflated prices, Defendants have ensured that the retail pharmacy customers who dispense Enoxaparin receive inflated reimbursement and profits from public health care programs, including Medicaid.  Well acquainted with Medicaid reimbursement rates, Defendants rely on the resulting "pricing spread" between the fraudulently inflated prices reported to the pricing

compendia and the prices their retail pharmacy customers paid as an inducement to the retail pharmacies to purchase Enoxaparin.

7.      Defendants' fraudulent pricing schemes have allowed them to increase profits by boosting sales for Enoxaparin.  Defendant Amphastar, for example, boasts that its "long-standing relationship with the major group purchasing organizations and drug wholesalers in the U.S. enables it to establish significant market share upon the introduction of its new products."[1]

## II.      INTRODUCTION TO GOVERNMENT PLAINTIFFS

8.      The governmental plaintiffs in this lawsuit are United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Vermont, and Washington, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and Doe States 1-21.

9.      Plaintiff Doe States 1-21 include the states that subsequent to the initiation of this action enact *qui tam* statutes that include the right to initiate *qui tam* lawsuits, or whose previously enacted statutes become effective after the filing of the Complaint.  The Doe States 1-21 include the States of Alabama, Alaska, Arizona, Arkansas, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, West Virginia, Wisconsin, and Wyoming.

---

[1] *See* "About Us" section on Amphastar's website at http://www.amphastar.com/about-us.html.

### III.   PARTIES

#### A.   Relator

10.     Relator currently resides in Dumfries, Virginia.  He completed the St. John's University's College of Pharmacy and Allied Health Professions Doctor of Pharmacy Degree program in 2007.  He has since maintained his pharmacist license.  Upon becoming licensed, he worked at Walgreens as a pharmacist for two years.  In November 2009, Relator left Walgreens and opened his own pharmacy, the Potomac Health Pharmacy, in Woodbridge, Virginia.

11.     Relator operated his pharmacy for a year before he chose to close the pharmacy in November 2010, primarily because the pharmaceutical reimbursement from private insurance companies did not allow him to realize an acceptable profit margin.  He then worked for Med-Co as a consultant pharmacist, and he currently works for Target as a pharmacist.  As explained *infra*, Relator discovered Defendants' alleged fraudulent pricing scheme while employed at Target and has filled Enoxaparin prescriptions for patients covered by public health care programs.

#### B.   Defendants

12.     Amphastar Pharmaceuticals, Inc., is a corporation with its principal place of business located in Rancho Cucamonga, California. Amphastar may be served through its registered agent, the Corporation Trust Company, 1209 N. Orange St., Wilmington, DE 19801. Established in 1996, Amphastar develops, manufactures, and markets injectable products, including Enoxaparin. Amphastar is a publicly traded company, and it conducts extensive business around the United States. On February 19, 2011, the Food and Drug Administration (FDA) approved Amphastar's Abbreviated New Drug Application (ANDA) for Enoxaparin. The same day, Amphastar announced that it had signed an agreement with drug manufacturing giant Watson Pharmaceuticals, Inc.  As part of the agreement, Amphastar co-promotes Enoxaparin

with Actavis, Inc. (formerly Watson, as explained *infra*), and the parties split revenue from Enoxaparin sales. The parties operate as a single business enterprise. On October 31, 2012, Watson acquired the Actavis Group, and in Q1 2013, Watson adopted Actavis's name and became Actavis, Inc. Actavis, Inc. is the successor in interest to Watson.

13.    Actavis, Inc. is a corporation with its principal place of business in Parsippany, New Jersey. Actavis may be served through its registered agent, the Corporation Trust Company, 1209 N. Orange St., Wilmington, DE 19801. On May 16, 2013, Actavis became a wholly-owned subsidiary of Actavis, PLC, incorporated in Dublin, Ireland. On March 17, 2015, Actavis, PLC acquired Allergan, PLC. On June 15, 2015, following shareholder approval, Actavis, PLC began operating as Allergan. Allergan is the successor in interest to Actavis, PLC. Actavis is a wholly-owned subsidiary of Allergan.

14.    Although Actavis, PLC, assumed the Allergan name after acquiring it, Allergan continues to operate as Actavis, PLC for purposes of selling pharmaceuticals within the United States. On July 27, 2015, Allergan's CEO, Brent Saunders, announced that Allergan reached an agreement with Teva Pharmaceutical Industries, Ltd., whereby Allergan would sell Teva its generic drug unit for approximately $40.5 billion dollars. The parties reportedly anticipate finalizing the sale in Q1 2016.

15.    Sandoz, Inc. is the generic pharmaceutical division of Novartis AG, also called the Novartis Group, with its United States headquarters located in Princeton, New Jersey. Sandoz may be served through its registered agent, the Corporation Service Company, at 1560 Broadway, Ste. 2090, Denver, CO 80202. Sandoz provides generic pharmaceuticals to the American market and conducts extensive business throughout the United States.

16.     Teva Pharmaceuticals USA, Inc., is a corporation with its principal place of business located in North Wales, Pennsylvania. Teva may be served through its registered agent, the Corporate Creations Network, Inc., at 3411 Silverside Road #104, Wilmington, DE 19810. Teva develops, manufactures, markets, and distributes generic drug products. Teva owns and operates more than thirty facilities across the United States and its Territories and conducts extensive business throughout the United States.

17.     Winthrop U.S. is the generic pharmaceutical division of Sanofi-Aventis U.S. LLC, with its principal place of business located in Bridgewater, New Jersey. Winthrop and Sanofi-Aventis may both be served through their registered agent, Corporation Service Company d/b/a CSC, 211 E. 7th Street, Suite 620, Austin, TX  78701. Winthrop U.S. and Sanofi-Aventis conduct extensive business throughout the United States.

### C.     Respondeat Superior and Vicarious Liability

18.     Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment.

19.     In September 2011, Defendant Amphastar entered into an agreement with Actavis (formerly Watson Pharmaceuticals, Inc.) whereby the parties agreed to co-promote Enoxaparin. The companies market Enoxaparin under one common label and share profits under this agreement.  As a result of this partnership, Amphastar and Actavis have realized sizable profits in the United States generic marketplace, and the parties operate as a single business enterprise.

20.     Defendants Winthrop and Sanofi-Aventis are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.  Further, the past, present, and continuing relations and dealings

6

by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

21.     Defendant Winthrop is a mere instrumentality and/or agent of Sanofi-Aventis U.S. LLC.  Without Winthrop, Sanofi-Aventis would have been forced to perform Winthrop's services themselves.

## IV.     JURISDICTION AND VENUE

22.     Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by the Defendants, some of which occurred in the District of New Mexico. Specifically, the New Mexico Medicaid program has reimbursed claims for Enoxaparin manufactured and promoted by all of the Defendants. Moreover, the United States currently pays over 70% of New Mexico's Medicaid expenditures, the highest of any of the states on behalf of which Relator brings this action.[2]

23.     The Defendants engage in business in the State of New Mexico and within the District of New Mexico, all of which they accomplish through their corporate centers, business units, subsidiaries, officers, directors, employees, and agents.  All Defendants are subject to the general and specific personal jurisdiction of this Court pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. §3729. Pendent jurisdiction is also proper over Relator's state claims under 18 U.S.C. § 3732 and 28 U.S.C. § 1367.

---

[2] Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2015 Through September 30, 2016, 79 Fed. Reg. 71,426, 71,428 (Dec. 2, 2014).

### V.  MEDICAID REIMBURSEMENT FOR GENERIC DRUGS

#### A.  Overview of the Medicaid Program

24.    Medicaid was established by Title XIX of the Federal Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Program").  Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

25.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  *See* 42 U.S.C. § 1396a.  The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the various states, the FMAP is at least 50%, and runs as high as 74%.

26.    The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

27.    Some states, such as Indiana, Massachusetts, Montana, and Nevada, require drug manufacturers to submit an application in order to be placed on the state's formulary list and receive reimbursement from the state's Medicaid program.  For example, in Massachusetts, as more fully explained herein, pharmacists must sign an agreement attesting that they will adhere to all regulations governing MassHealth, Massachusetts's Medicaid program, as well as complying with all federal and state laws, which prohibit fraudulent acts and false reporting, including the federal Anti-Kickback Statutes.

8

B.     **Medicaid Drug Reimbursement**

1.     **National Drug Codes**

28.     The Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution. 21 U.S.C. § 355. The FDA assigns to each listed drug product a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC"). The FDA has assigned the following NDC codes for Enoxaparin:

| Defendant | Enoxaparin Description | NDC Code |
|---|---|---|
| Actavis | ENOXAPARIN 30 MG/0.3 ML SYR | 62037-0839-20 |
| Actavis | ENOXAPARIN 40 MG/0.4 ML SYR | 62037-0849-20 |
| Actavis | ENOXAPARIN 60 MG/0.6 ML SYR | 62037-0861-20 |
| Actavis | ENOXAPARIN 80 MG/0.8 ML SYR | 62037-0862-20 |
| Actavis | ENOXAPARIN 100 MG/ML SYRINGE | 62037-0863-20 |
| Actavis | ENOXAPARIN 120 MG/0.8 ML SYR | 62037-0864-20 |
| Actavis | ENOXAPARIN 150 MG/ML SYRINGE | 62037-0866-20 |
|  |  |  |
| Amphastar | ENOXAPARIN 30 MG/0.3 ML SYR | 00548-5601-00 |
| Amphastar | ENOXAPARIN 30 MG/0.3 ML SYR | 00548-5631-00 |
| Amphastar | ENOXAPARIN 40 MG/0.4 ML SYR | 00548-5602-00 |
| Amphastar | ENOXAPARIN 40 MG/0.4 ML SYR | 00548-5632-00 |
| Amphastar | ENOXAPARIN 60 MG/0.6 ML SYR | 00548-5633-00 |
| Amphastar | ENOXAPARIN 60MG/0.6 ML SYR | 00548-5603-00 |
| Amphastar | ENOXAPARIN 80 MG/0.8 ML SYR | 00548-5634-00 |
| Amphastar | ENOXAPARIN 80 MG/0.8 ML SYR | 00548-5604-00 |

9

| | | |
|---|---|---|
| Amphastar | ENOXAPARIN 100 MG/ML SYRINGE | 00548-5635-00 |
| Amphastar | ENOXAPARIN 100 MG/ML SYRINGE | 00548-5605-00 |
| Amphastar | ENOXAPARIN 120 MG/0.8 ML SYR | 00548-5636-00 |
| Amphastar | ENOXAPARIN 120 MG/0.8 ML SYR | 00548-5606-00 |
| Amphastar | ENOXAPARIN 150 MG/ML SYRINGE | 00548-5637-00 |
| | | |
| Sandoz | ENOXAPARIN 30 MG/0.3 ML SYR | 00781-3133-01 |
| Sandoz | ENOXAPARIN 30 MG/0.3 ML SYR | 00781-3133-63 |
| Sandoz | ENOXAPARIN 40 MG/0.4 ML SYR | 00781-3224-02 |
| Sandoz | ENOXAPARIN 40 MG/0.4 ML SYR | 00781-3224-64 |
| Sandoz | ENOXAPARIN 60 MG/0.6 ML SYR | 00781-3356-03 |
| Sandoz | ENOXAPARIN 60 MG/0.6 ML SYR | 00781-3356-66 |
| Sandoz | ENOXAPARIN 80 MG/0.8 ML SYR | 00781-3428-04 |
| Sandoz | ENOXAPARIN 80 MG/0.8 ML SYR | 00781-3428-68 |
| Sandoz | ENOXAPARIN 100 MG/ML SYRINGE | 00781-3500-05 |
| Sandoz | ENOXAPARIN 100 MG/ML SYRINGE | 00781-3500-69 |
| Sandoz | ENOXAPARIN 120 MG/0.8 ML SYR | 00781-3612-04 |
| Sandoz | ENOXAPARIN 120 MG/0.8 ML SYR | 00781-3612-68 |
| Sandoz | ENOXAPARIN 150 MG/ML SYRINGE | 00781-3655-05 |
| Sandoz | ENOXAPARIN 150 MG/ML SYRINGE | 00781-3655-69 |
| | | |
| Teva | ENOXAPARIN 150 MG/ML SYRINGE | 00703-8510-21 |
| Teva | ENOXAPARIN 150 MG/ML SYRINGE | 00703-8510-23 |
| Teva | ENOXAPARIN 30 MG/0.3 ML SYR | 00703-8530-21 |

| Teva | ENOXAPARIN 30 MG/0.3 ML SYR | 00703-8530-23 |
|------|------------------------------|---------------|
| Teva | ENOXAPARIN 40 MG/0.4 ML SYR | 00703-8540-21 |
| Teva | ENOXAPARIN 40 MG/0.4 ML SYR | 00703-8540-23 |
| Teva | ENOXAPARIN 60 MG/0.6 ML SYR | 00703-8560-21 |
| Teva | ENOXAPARIN 60 MG/0.6 ML SYR | 00703-8560-23 |
| Teva | ENOXAPARIN 100 MG/ML SYRINGE | 00703-8580-21 |
| Teva | ENOXAPARIN 100 MG/ML SYRINGE | 00703-8580-23 |
| Teva | ENOXAPARIN 120 MG/0.8 ML SYR | 00703-8610-21 |
| Teva | ENOXAPARIN 120 MG/0.8 ML SYR | 00703-8610-23 |
| Teva | ENOXAPARIN 80 MG/0.8 ML SYR | 00703-8680-21 |
| Teva | ENOXAPARIN 80 MG/0.8 ML SYR | 00703-8680-23 |
|      |                              |               |
| Winthrop | ENOXAPARIN 30 MG/0.3 ML SYR | 00955-1003-10 |
| Winthrop | ENOXAPARIN 40 MG/0.4 ML SYR | 00955-1004-10 |
| Winthrop | ENOXAPARIN 60 MG/0.6 ML SYR | 00955-1006-10 |
| Winthrop | ENOXAPARIN 80 MG/0.8 ML SYR | 00955-1008-10 |
| Winthrop | ENOXAPARIN 100 MG/ML SYRINGE | 00955-1010-10 |
| Winthrop | ENOXAPARIN 120 MG/0.8 ML SYR | 00955-1012-10 |
| Winthrop | ENOXAPARIN 150 MG/ML SYRINGE | 00955-1015-10 |

29.     The Defendants, similar to other generic drug manufacturers, do not typically submit claims for reimbursement to federal health care programs.  Instead, the Defendants sell Enoxaparin either directly to retail pharmacies or to retail pharmacies via wholesalers, such as McKesson and AmerisourceBergen.   After dispensing Enoxaparin, these retail pharmacies

submit claims to payors, such as Medicaid, for reimbursement of Enoxaparin. Medicaid claims submitted by retail pharmacies are typically processed and tracked using the applicable NDC codes.

30.     The Defendants report to various drug price publishers the amounts that they have supposedly charged for Enoxaparin.  The price publishers use this information to publish pricing compendia such as the *Red Book*.  Medicaid in turn relies on this published pricing information to determine the reimbursement rates for drugs, including Enoxaparin.

31.     The Defendants sell Enoxaparin to wholesalers and retail pharmacy customers at prices that are dramatically lower than the prices they report to pricing compendia.  The Defendants' false price-reporting causes federal and state health programs, including Medicaid, to reimburse retail pharmacies' claims at inflated levels significantly above Enoxaparin's actual pricing, as described below.

## 2.     Medicaid Reimbursement Formulas

32.     The goal of the states' Medicaid programs is to reimburse for drugs at an amount that reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public for covered drugs.  Federal regulations define EAC in part as "the agency's best estimate of the price generally and currently paid by providers for a drug…." 42 C.F.R. § 447.301.  To determine the EAC for a covered drug, state Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of Health and Human Services.

33.     While each state's specific reimbursement formula varies,[3] the state Medicaid programs generally reimburse for each drug based on the lowest of (a) the EAC as set by the states, (b) MAC set by the state Pharmaceutical Reimbursement Boards, or (c) the provider's usual and customary charge.  The provider's usual and customary charge is typically not the lowest price and therefore is seldom used.

### i.     Establishing the EAC

34.     The different state methodologies for arriving at the EAC include:

(1)     discounting a percentage off of the Average Wholesale Price ("AWP");

(2)     adding a percentage to the Wholesale Acquisition Cost ("WAC"); and/or

(3)     requiring the drug companies to certify prices directly in writing to the Medicaid program.

35.     "AWP" is used to refer to the price at which a pharmaceutical firm or wholesaler sells a drug to a retail customer who then administers it to a patient.  "WAC" is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail customer.

36.     The majority of states use published AWPs to calculate reimbursement; however, a handful of states, such as Florida, use the WAC to set the EAC.

37.     The AWPs and WACs used by state Medicaid programs are those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications; (2) First Databank, publisher of the *Blue Book* and other electronic publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide. Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the

---

[3] *See* Exhibit 1 (Information on each state's Medicaid drug reimbursement methodology obtained from http://medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/downloads/xxxreimbursement-chart-current-qtr.pdf).

"Publishers" and their various publications and data service are hereinafter referred to as "Price Publications."

38.     In addition to using the manufacturers' reported prices as published in the Price Publications, some state Medicaid programs also require price representations directly from the manufacturers and use these reported prices to confirm the accuracy of the figures they use to determine state reimbursements.

39.     Pursuant to section 6001 of the Deficit Reduction Act of 2005, Pub.L. 109-171, (effective January 1, 2007), section 2503 of the Patient Protection and Affordable Care Act Pub.L. 111-148 (2010) and the Education Jobs and Medicaid Assistance Act Pub. L. 111-226 (2010), the Centers for Medicare and Medicaid Services ("CMS") is required to provide States with "average manufacturer price" data as that term is now defined, effective October 1, 2010.

### ii.     Maximum Acquisition Cost (MAC)

40.     Additionally, for generic or multiple source drugs, states may establish their own payment ceilings known as the maximum acquisition cost, or "MAC."  When multiple generic equivalent drugs are available, states have the option of imposing a MAC that sets a cap on the reimbursement payment for the brand and generic versions of the same drug.  As establishing a MAC is optional, states do not necessarily adopt a MAC for every available generic drug.

41.     States' methods for establishing a MAC include: (i) setting a MAC at the lowest published price for a generic version of the drug, (ii) manually setting a MAC based on surveys of pharmacies to determine the actual acquisition costs for generics from manufacturers, or (iii) using the Federal Upper Limit (FUL) that is updated twice a year.[4]  Under the MAC formula, states establish a single price for each generic regardless of the manufacturer of the generic.  As

---

[4] There is currently no FUL for Enoxaparin. *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Federal-Upper-Limits.html.

of June 2015, all but seven states had established MACs.[5]  If a generic does not have a MAC price, the state generally reimburses pharmacies at AWP minus a range of ten to twenty-five percent for the drug.

## VI.   MEDICARE PART D

42.    Medicare Part D is a federal program meant to subsidize the costs of prescription drugs for Medicare beneficiaries.  It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.  Part D only covers prescription drugs and will not assist with any other medical procedure.  Among those individuals eligible for Medicare Part D are individuals with dual-eligibility (beneficiaries enrolled in both Medicare and Medicaid), who prior to 2006 had received outpatient drug benefits through Medicaid.  Although Medicare Part D is a component of Medicare, each of the fifty states and the District of Columbia are required to make a contribution to defray a portion of the cost of Medicare Part D for beneficiaries whose Medicaid drug coverage has been assumed by Medicare Part D.  42 C.F.R. § 423.910(a) (2008).

43.    A Medicare beneficiary enrolled in Medicare Part D chooses a Prescription Drug Plan (PDP), which is administered by a private insurance company, or "sponsor," based upon the beneficiary's specific drug requirements.   Part D sponsors are required by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 to offer, at a minimum, a basic prescription drug benefit that is either the standard prescription drug benefit or is actuarially equivalent to the standard benefit.  The standard costs structure makes beneficiaries responsible for certain costs, which may include a monthly premium, an annual deductible, and coinsurance.

---

[5] The states that do not have MACs are Arizona, Colorado, Mississippi, Nevada, Oregon, Rhode Island, and Wyoming. *See* Ex. 1 (Information on each state's Medicaid drug reimbursement methodology obtained from http://medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/downloads/xxxreimbursement-chart-current-qtr.pdf).

15

44.     All Part D plan sponsors submit data and information necessary for CMS to determine and make payment.  Every time a beneficiary fills a prescription covered under Part D, plan sponsors must submit a summary called the prescription drug event ("PDE") record.  The PDE record contains drug cost and payment data that enables CMS to administer the Part D benefit.  Part D plan sponsors submit one PDE record each time a Part D covered drug is dispensed to its enrollees, even for those events in which enrollees have 100 percent cost sharing (i.e., they are in the coverage gap or deductible phase).

45.     In order to participate in Medicare, pharmacies and other providers must first sign enrollment agreements.  These agreements require providers to certify that they understand that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . the Federal anti-kickback statute."

### VII.    TRICARE, CHAMPVA AND FEHBP REIMBURSEMENT

46.     In addition to Medicaid and Medicare Part D, the federal and state governments reimburse a portion of the cost of prescription drugs under several other federal and state health care programs, including TRICARE, the Civilian Health and Medical Program of the Veterans Administration (CHAMPVA), and the Federal Employees Health Benefits Plan (FEHBP).

47.     TRICARE (formerly known as CHAMPUS) is a federally funded health care program that provides civilian health benefits for military personnel, military retirees, and their dependents.  CHAMPVA is a federally funded healthcare program for the families and survivors of veterans who have been rated permanently and totally disabled for a service-connected disability and for the survivors of a military member who died in the line of duty, not due to misconduct.  The FEHBP is administered by the Office of Personnel Management and provides health insurance for federal employees, retirees, and survivors.  Coverage of prescription drugs under these programs is similar to coverage under the Medicaid program.  *See, e.g.*, 32 C.F.R. §§

16

199.2 and 199.4(g)(15)(i); TRICARE Policy Manual 6010.54-M, Chapter 8, Section 9.1(B)(2) (August 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II.

48.     Pharmacies make express and/or implied certifications in their TRICARE provider enrollment forms that they will comply with all federal and state laws applicable to TRICARE**.** *See, e.g.,* 32 C.F.R. § 199.6(a)(13) (requiring CHAMPUS provider participation agreements to include provision obligating provider to "comply with the applicable provisions of this part and related CHAMPUS administrative policy").  Provider applications for FEHB programs contain similar requirements.  In addition, when TRICARE, CHAMPVA and FEHB providers submit a claim to CMS, they certify, expressly and/or impliedly, that the claim is eligible for payment and in compliance with all laws and regulations governing Medicare.

## VIII.   RELATOR'S DISCOVERY OF DEFENDANTS' FRAUDULENT PRICING SCHEMES

49.     While operating his own pharmacy and working with pharmaceutical pricing information on a daily basis, Relator became knowledgeable about drug acquisition costs and all aspects of the pharmaceutical billing and reimbursement process.  After noticing that the reimbursement amounts paid by Medicaid and other Public health care programs for Enoxaparin was much higher than Target's acquisition cost, Relator decided to investigate. Relator understood, having taken a class at St. John's, which included information on *qui tam* litigation and the concept of pricing spreads, that the discrepancy in the Government reimbursement rates could indicate that he was seeing various pricing spread schemes.

50.     Relator initially focused his inquiry on Amphastar's and Actavis's pricing for Enoxaparin. Target typically purchases Enoxaparin manufactured and promoted by Amphastar and Actavis through Anda, Inc. ("Anda"), Allergan's drug distribution business.[6] While

---

[6] As explained in Section III.B, Actavis is a wholly-owned subsidiary of Allergan.

processing claims for Enoxaparin, Relator was able to view Target's acquisition costs and was shocked at the disparity between those numbers versus the amount of reimbursement Target received from Public health care programs.

51.     Relator then broadened his focus to encompass pricing offered by the other Defendants. Target uses McKesson, a wholesaler, when it purchases Enoxaparin manufactured by Sandoz, Teva, or Winthrop. Due to his position at Target, Relator was able to access the pricing offered to Target by McKesson. The retail prices that Target pays Anda and McKesson for Enoxaparin are the same nationwide, because Target's contract with both entities covers all Target stores. Relator compared the acquisition costs for Enoxaparin manufactured and promoted by Amphastar and Actavis offered through Anda, as well as McKesson's pricing for Enoxaparin manufactured by the other Defendants, to Medicaid reimbursement rates for several states and found a shockingly large disparity.

52.     Relator then reached out to a colleague who owns and operates a small pharmacy in New York and inquired as to what his colleague's pharmacy pays its wholesaler, AmerisourceBergen, for Enoxaparin. Relator obtained a copy of the pricing offered by AmerisourceBergen and found a similar disparity between his colleague's acquisition costs for Enoxaparin versus the amount reimbursed by New York Medicaid. In fact, Relator also obtained a screen shot of a New York Medicaid patient's claim and invoice and discovered that New York Medicaid paid approximately 133% more than what his colleague's pharmacy paid for the Enoxaparin dispensed to that patient.

53.     Relator gained first-hand knowledge of Defendants' fraudulent pricing schemes through his investigation and obtained claims documents and wholesaler pricing data as part of that investigation. Relator obtained screen shots from Target's computer system showing

18

Target's acquisition costs and the corresponding amount of reimbursement from TriCare, Medicare Part D, and Virginia Medicaid.

## IX.   DEFENDANTS' FRAUDULENT PRICING

### A.   Fraudulent Reporting of Prices

54.    Based on Relator's direct and independent knowledge, which he gleaned in part by filling Enoxaparin prescriptions for patients covered by public health care programs, the Defendants have defrauded the Government by knowingly causing these programs to pay false or fraudulent prices for Enoxaparin.  As part of their pricing scheme, the Defendants knowingly made false or fraudulent representations about Enoxaparin's pricing and costs to the Publishers, knowing that public health care programs would use this information to calculate reimbursement when paying or approving claims for Enoxaparin.  The Defendants made these representations in order to use the "spread" between the price offered to retail customers and the actual reimbursement from public health care programs to induce their retail pharmacy customers to purchase Enoxaparin.

55.    The Defendants priced Enoxaparin through wholesalers, including Anda, McKesson, and AmerisourceBergen, at far lower prices than those reported to the Publishers and some states.  Public health care programs paid the claims received from the Defendants' retail pharmacy customers that were based on the inflated AWPs and WACs.  State Medicaid programs also relied on these published prices for establishing their MACs. The resulting reimbursements far exceed the retail pharmacies' actual costs for Enoxaparin.

56.    The AWP and WAC prices reported by Defendants had no relationship to the actual prices being paid by retail pharmacy customers for Enoxaparin.  The Defendants knew

that Medicaid used these published AWP and WAC prices to define the EAC and also that state Medicaid programs use these published prices to determine MACs.

**B.      Pricing of Enoxaparin**

57.      As a result of his investigation, Relator was able to gain firsthand knowledge and a collection of documents reflecting a large discrepancy between the retail price for Enoxaparin offered by wholesalers and reimbursement rates paid by public health care programs. Relator obtained screen shots showing Target's acquisition costs for Enoxaparin purchased through Anda. Relator also ran an inquiry for Enoxaparin in McKesson's database using Target's computer system, and the search results, attached as Exhibit 2, contain Enoxaparin's reported AWP and the retail prices for Enoxaparin offered by McKesson to Target.[7] The AmerisourceBergen wholesaler pricing data that Relator obtained from his colleague is attached as Exhibit 3.

**1.      AWP Spreads and Spread Percentages**

**i.      Actavis/Amphastar**

58.      Exhibits 4 – 10 consist of seven screen shots obtained by Relator from Target's computer system showing the acquisition costs for each strength of Enoxaparin manufactured and promoted by Actavis and Amphastar that Target purchased through Anda. The McKesson catalog shows the reported AWP for Enoxaparin manufactured and promoted by Amphastar and Actavis. Ex. 2. The following summary chart, which is based on comparing the acquisition cost for each strength and the reported AWP for each strength, shows the following spread amounts and percentages:

| Strength/NDC | Target's Cost (per syringe) | Reported AWP (per syringe) | Spread | Spread Percentage | Exhibit Nos. |
|---|---|---|---|---|---|

---

[7] Exhibit 2 also contains Relator's handwritten notes.

| | | | | | |
|---|---|---|---|---|---|
| Enoxaparin 30mg/0.3ml NDC 62037-0839-20 | $4.30 | $24.35 | $20.05 | **466.28%** | Exs. 2, 4 |
| Enoxaparin 40mg/0.4ml NDC 62037-0849-20 | $5.26 | $32.47 | $27.21 | **517.3%** | Exs. 2, 5 |
| Enoxaparin 60mg/0.6ml NDC 62037-0861-20 | $7.90 | $48.77 | $40.87 | **517.34%** | Exs. 2, 6 |
| Enoxaparin 80mg/0.8ml NDC 62037-0862-20 | $10.53 | $65.02 | $54.49 | **517.47%** | Exs. 2, 7 |
| Enoxaparin 100mg/1ml NDC 62037-0863-20 | $13.16 | $81.27 | $68.11 | **517.55%** | Exs. 2, 8 |
| Enoxaparin 120mg/0.8ml NDC 62037-0864-20 | $15.79 | $97.56 | $81.77 | **517.86%** | Exs. 2, 9 |
| Enoxaparin 150mg NDC 62037-0866-20 | $19.74 | $121.96 | $102.22 | **517.83%** | Exs. 2, 10 |

A screen shot from Target's computer system listing the NDC codes for Enoxaparin manufactured and promoted by Defendants Amphastar and Actavis is attached as Exhibit 11. Exhibit 12 consists of a more detailed chart summarizing the calculations above, as well as the McKesson search results with markings to designate the rows showing the AWPs for Enoxaparin manufactured and promoted by Amphastar and Actavis.

### ii.  Sandoz

59.    Exhibit 2 shows Target's acquisition cost for each strength of Enoxaparin manufactured and promoted by Sandoz that Target purchased through McKesson, as well as the reported AWP for each strength. The following summary chart, which is based on comparing the acquisition costs for each strength and the reported AWP for each strength, shows the following spread amounts and percentages:

| Strength/NDC | Target's Cost (per syringe) | Reported AWP (per syringe) | Spread | Spread Percentage | Exhibit Nos. |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Enoxaparin 30mg/0.3ml NDC 00781-3133-63 | $8.04 | $24.35 | $16.31 | **202.86%** | Ex. 2 |
| Enoxaparin 40mg/0.4ml NDC 00781-3224-64 | $9.80 | $32.47 | $22.67 | **231.33%** | Ex. 2 |
| Enoxaparin 60mg/0.6ml NDC 00781-3356-66 | $15.33 | $48.77 | $33.44 | **218.13%** | Ex. 2 |
| Enoxaparin 80mg/0.8ml NDC 00781-3428-68 | $22.05 | $65.02 | $42.97 | **194.88%** | Ex. 2 |
| Enoxaparin 100mg/1ml NDC 00781-3500-69 | $24.34 | $81.27 | $56.93 | **233.89%** | Ex. 2 |
| Enoxaparin 120mg/0.8ml NDC 00781-3612-68 | $28.97 | $97.56 | $68.59 | **236.76%** | Ex. 2 |
| Enoxaparin 150mg NDC 00781-3655-69 | $37.42 | $121.96 | $84.54 | **225.92%** | Ex. 2 |

Exhibit 13 consists of a more detailed chart summarizing the calculations above, as well as the McKesson search results with markings to designate the rows showing the AWPs for Enoxaparin manufactured and promoted by Sandoz.

### iii.   Teva

60.    Exhibit 2 shows Target's acquisition costs for each strength of Enoxaparin manufactured and promoted by Teva that Target purchases through McKesson, as well as the reported AWP for each strength. The following summary chart, which is based on comparing the acquisition costs for each strength and the reported AWP for each strength, shows the following spread amounts and percentages:

| Strength/NDC | Target's Cost (per syringe) | Reported AWP (per syringe) | Spread | Spread Percentage | Exhibit Nos. |
|---|---|---|---|---|---|
| Enoxaparin 30mg/0.3ml NDC 00703-8530-23 | $8.04 | $15.84 | $7.80 | **97.01%** | Ex. 2 |
| Enoxaparin | $9.80 | $21.12 | $11.32 | **115.51%** | Ex. 2 |

22

| Strength/NDC | | | | | |
|---|---|---|---|---|---|
| 40mg/0.4ml NDC 00703-8540-23 | | | | | |
| Enoxaparin 60mg/0.6ml NDC 00703-8560-23 | $15.33 | $31.68 | $16.35 | **106.65%** | Ex. 2 |
| Enoxaparin 80mg/0.8ml NDC 00703-8680-23 | $22.05 | $42.24 | $20.19 | **91.56%** | Ex. 2 |
| Enoxaparin 100mg/1ml NDC 00703-8580-23 | $24.34 | $52.80 | $28.46 | **116.93%** | Ex. 2 |
| Enoxaparin 120mg/0.8ml NDC 00703-8610-23 | $28.97 | $63.33 | $34.36 | **118.61%** | Ex. 2 |
| Enoxaparin 150mg NDC 00703-8510-23 | $37.42 | $79.20 | $41.78 | **111.65%** | Ex. 2 |

Exhibit 14 consists of a more detailed chart summarizing the calculations above, as well as the McKesson search results with markings to designate the rows showing the AWPs for Enoxaparin manufactured and promoted by Teva.

61. Exhibit 3 shows the acquisition costs for each strength of Enoxaparin manufactured and promoted by Teva purchased through AmerisourceBergen, and Exhibit 2 shows the reported AWP for each strength. The following summary chart, which is based on comparing the acquisition costs for each strength and the reported AWP for each strength, shows the following spread amounts and percentages:

| Strength/NDC | Amerisource Bergen Price (per syringe) | Reported AWP (per syringe) | Spread | Spread Percentage | Exhibit Nos. |
|---|---|---|---|---|---|
| Enoxaparin 30mg/0.3ml NDC 00703-8530-23 | $5.33 | $15.84 | $10.51 | **197.19%** | Exs. 2, 3 |
| Enoxaparin 40mg/0.4ml NDC 00703-8540-23 | $6.18 | $21.12 | $14.94 | **241.75%** | Exs. 2, 3 |
| Enoxaparin 60mg/0.6ml NDC 00703-8560-23 | $7.73 | $31.68 | $23.95 | **309.83%** | Exs. 2, 3 |

| | | | | | |
|---|---|---|---|---|---|
| Enoxaparin 80mg/0.8ml NDC 00703-8680-23 | $11.61 | $42.24 | $30.63 | **263.82%** | Exs. 2, 3 |
| Enoxaparin 100mg/1ml NDC 00703-8580-23 | $12.25 | $52.80 | $40.55 | **331.02%** | Exs. 2, 3 |
| Enoxaparin 120mg/0.8ml NDC 00703-8610-23 | $15.09 | $63.33 | $48.24 | **319.68%** | Exs. 2, 3 |
| Enoxaparin 150mg NDC 00703-8510-23 | $19.71 | $79.20 | $59.49 | **301.83%** | Exs. 2, 3 |

Exhibit 15 consists of a more detailed chart summarizing the calculations above as to Teva's pricing offered through AmerisourceBergen.

### iv.     Winthrop

62.     Exhibit 2 shows Target's acquisition costs for each strength of Enoxaparin manufactured and promoted by Winthrop that Target purchases through McKesson, as well as the reported AWP for each strength. The following summary chart, which is based on comparing the acquisition costs for each strength and the reported AWP for each strength, shows the following spread amounts and percentages:

| Strength/NDC | Target's Cost (per syringe) | Reported AWP (per syringe) | Spread | Spread Percentage | Exhibit Nos. |
|---|---|---|---|---|---|
| Enoxaparin 30mg/0.3ml NDC 00955-1003-10 | $7.78 | $26.76 | $18.98 | **243.96%** | Ex. 2 |
| Enoxaparin 40mg/0.4ml NDC 00955-1004-10 | $9.37 | $35.68 | $26.31 | **280.79%** | Ex. 2 |
| Enoxaparin 60mg/0.6ml NDC 00955-1006-10 | $14.71 | $53.58 | $38.87 | **264.24%** | Ex. 2 |
| Enoxaparin 80mg/0.8ml NDC 00955-1008-10 | $21.32 | $71.45 | $50.13 | **235.13%** | Ex. 2 |
| Enoxaparin 100mg/1ml NDC 00955-1010-10 | $23.11 | $89.31 | $66.20 | **286.46%** | Ex. 2 |

| | | | | |
|---|---|---|---|---|
| Enoxaparin 120mg/0.8ml NDC 00955-1012-10 | $28.04 | $107.20 | $79.16 | **282.31%** | Ex. 2 |
| Enoxaparin 150mg NDC 00955-1015-10 | $36.27 | $134.01 | $97.74 | **269.48%** | Ex. 2 |

Exhibit 16 consists of a more detailed chart summarizing the calculations above, as well as the McKesson search results with markings to designate the rows showing the AWPs for Enoxaparin manufactured and promoted by Winthrop.

### 2.    Specific Patient Claims

63.    Exhibit 17 contains Patient One's claim and invoice for Sandoz's Enoxaparin 100mg/1ml (NDC 00781-3500-69) showing that the patient filled a prescription for 30 milliliters of Enoxaparin, which equates to 30 syringes. Exhibit 17 also shows that the New York pharmacy filling the prescription paid $1,164.62 for the 30 syringes and that a New York Medicaid managed care plan reimbursed the pharmacy $2,713.89.[8] The resulting spread between the pharmacy's cost and the New York Medicaid reimbursement amount is $1,549.27, which expressed as a percentage equates to **133.02%**.

64.    Exhibit 19 contains Patient Two's claim and invoice for Amphastar/Actavis's Enoxaparin 60mg/0.6ml (NDC 62037-0861-20). Exhibit 20 consists of a Target Pharmacy Controlled Drug Detail Report, which shows that the patient filled a prescription for 18 milliliters of Enoxaparin, which equates to 30 syringes.[9] Exhibit 19 shows that Target paid $237.00 for the 30 syringes and that TRICARE and Medco Health reimbursed Target $410.92.

---

[8] Based on the Group identification number on the invoice (RX4212), Affinity Health Plan is the Medicaid managed care plan that reimbursed the pharmacy. *See* Exhibit 18 for a list of New York Medicaid managed care plans and group identification numbers.
[9] The quantities shown in Exhibit 20 are in milliliters. The number of syringes dispensed to the patient is determined by dividing the quantity of milliliters dispensed by the number of milliliters per syringe.

The resulting spread between Target's acquisition cost for 30 syringes and the reimbursement from TRICARE and Medco Health is $173.92, which expressed as a percentage equals **73.29%**.

65.      Exhibit 21 contains Patient Three's claim and invoice for Amphastar/Actavis's Enoxaparin 80mg/0.8ml (NDC 62037-0862-20). Exhibit 22 shows that the patient filled a prescription for 4.8 milliliters of Enoxaparin, which equates to 6 syringes. Exhibit 21 shows that Target paid $63.18 for the 6 syringes and that the Virginia Medicaid reimbursement was $98.92. The resulting spread between Target's acquisition cost and the Virginia Medicaid reimbursement amount is $35.74, which expressed as a percentage equates to **56.56%**.

66.      Exhibit 23 contains Patient Four's claim and invoice for Winthrop's Enoxaparin 120 mg/0.8ml (NDC 00955-1012-10). Exhibit 20 shows that the patient filled a prescription for 8 milliliters of Enoxaparin, which equates to 10 syringes. Exhibit 23 shows that Target paid $345.50 for the 10 syringes and that Medicare Part D reimbursement was $482.61. The resulting spread between Target's acquisition cost and the Medicare Part D reimbursement amount is $137.11, which expressed as a percentage equates to **39.68%**.

67.      These exhibits clearly show that the Defendants controlled and manipulated the reported prices for Enoxaparin to boost their sales at the expense of Public health care programs.

## X.      ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT

### A.      Applicable Law

#### 1.      The False Claims Act

68.      This is an action to recover damages and civil penalties on behalf of the United States and Relator Rahimi arising from the false or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

69.      For conduct occurring after May 20, 2009, the FCA provides that any person who

26

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008);

(C)     conspires to defraud the Government by committing a violation of the FCA;

\*\*\*

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  31 U.S.C. § 3729(a)(1).

70.     For conduct occurring after May 20, 2009, the FCA defines "claim" as:

(A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)     will reimburse such contractor, grantee, or other recipient for any portion of the money   or   property   which   is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

71.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

## 2.     The Federal Anti-Kickback Statute

72.     The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it illegal for an individual to knowingly and willfully offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal health care program.  *See* 42 U.S.C. § 1320a-7b(b)(2).  In pertinent part, the Anti-Kickback Statute provides:

(b) Illegal remuneration

(1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B)   to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).   Those who violate the statute also are subject to exclusion from participation in federal health care programs, and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.   42 U.S.C. § 1320a-7b(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

73.    "Remuneration" is broadly defined to include anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program.   Pursuant to the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false or fraudulent claim for purposes of the FCA.   See P.L. 111-148, § 6402, codified as 42 U.S.C. § 1320a-7b(g).

74.    The purpose of the Anti-Kickback Statute is to prohibit such activities in order to secure proper medical treatment and referrals and to limit unnecessary treatments, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services.   *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088, 3089 (proposed Jan. 23, 1989) (to be codified 42 C.F.R. pt. 1001).

75.    The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

76.     Based on these provisions, Relator Rahimi, on behalf of the United States Government and the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Vermont, and Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia, (collectively the "States") seeks through this action to recover damages and civil penalties arising from Defendants' causation of the submission of false claims to the federal and state governments.  In this case, such claims were submitted to the federal and state governments for payment for Enoxaparin.  Relator believes that the United States and the States have suffered significant damages.

77.     There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which the allegations are based.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. As required pursuant to 31 U.S.C. § 3730(b) and (e), Relator has voluntarily provided information, oral and/or written, prior to filing this Original Complaint. Relator submitted a pre-filing disclosure statement and referenced exhibits to the Attorney General of the United States and the United States Attorney for the District of New Mexico on November 4, 2015. Relator is also serving his Original Disclosure Statement and referenced exhibits simultaneously with the filing of this Original Complaint.

30

B.     **Defendants' Violations of the FCA**

    1.     **Presentation of False Claims (31 U.S.C. § 3729(a)(1);  31 U.S.C. § 3729(a)(1)(A))**

78.     The Defendants knowingly caused to be presented false or fraudulent claims for reimbursement (i.e., for payment or approval) to the United States for Enoxaparin, claims that were for substantially higher amounts of money than the retail pharmacies' actual acquisition costs and were based on Publishers' prices that the Defendants fraudulently and artificially created.  By creating and carrying out this fraudulent scheme, the Defendants knowingly and repeatedly violated the False Claims Act, 31 U.S.C. §3729(a)(1).

79.     Additionally, the Defendants violated the Anti-Kickback Statute when they knowingly established false and fraudulent AWP and WAC prices and reported such prices to the Publishers, as the Defendants knew that Medicaid relied on those prices to establish reimbursement rates for Enoxaparin.  The Defendants knowingly offered retail pharmacy customers much lower prices than those reported to Publishers to create a spread and induce customers to purchase Enoxaparin.  The Defendants knowingly used the spread as an unlawful inducement in violation of the federal Anti-Kickback Statute, causing false and fraudulent claims to be submitted.

80.     Kickback-tainted claims are non-reimbursable because compliance with the Anti-Kickback statute is a condition of payment of any claims submitted for payment to Federal health care programs.  Furthermore, claims resulting from a kickback scheme are inherently false or fraudulent as the claims are the product of false or fraudulent conduct.

81.     Given the structure of the health care systems at issue, Defendants' false statements and representations, and the false records that Defendants made, used, or caused to be

made or used, the Defendants' conduct had the potential to influence the government's payment decision.

82.     The ultimate submission by the retail pharmacies of false pharmaceutical claims to the state Medicaid programs was a foreseeable factor in the Government's loss and a consequence of the scheme.  Consequently, the States and the United States Government have suffered substantial damages.

## 2.     Making or Using False Records or Statements to Cause a Claim to be Paid (31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

83.     The Defendants knowingly made, used or caused to be made or used, false records or statements in order to cause false or fraudulent claims to be paid or approved by the United States. The Defendants made or caused to be made false representations regarding Enoxaparin when they reported false and fraudulent prices to the Publishers, knowing that the Medicaid programs used such prices to establish the EAC or MAC on which reimbursements were based.

84.     These false statements or records further consist of false certifications or representations made or caused to be made by the Defendants to state Medicaid programs when seeking to participate in the various programs. Retail pharmacies, such as Target, make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  The following are representative samples of the types of certifications health care providers make when entering Medicaid Provider Agreements with Medicaid programs.  While state Medicaid enrollment agreements are continually revised and updated, the certifications within these agreements, as described below, generally survive in similar form from revision to revision:

85.     When a provider enters into the "Medi-Cal Provider Agreement" with the State of California's Health and Human Services Agency, the provider agrees under the Provider Attestation section that "compliance with the provisions of this agreement is a condition precedent to payment to the provider."  Medi-Cal Provider Agreement, Item 40 Provider Attestation, at 8, (available on Medi-Cal's website and incorporated herein).  The agreement's provisions include the provider's obligation to comply with the California Department of Health Care Services' rules, regulations and provisions found in Chapters 7 and 8 of the Welfare and Institutions Code as well as all federal laws and regulations governing and regulating Medicaid providers.  Id. at 1, Item 2.  Furthermore, the provider agrees not to engage in or commit fraud or abuse including fraud under applicable federal or state laws and abuse that would result in unnecessary costs to health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state, or practices that are inconsistent with sound medical practices that result in reimbursement from health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state.  Id. at 3, Item 15.  Under Item 19 - Prohibition of Rebate, Refund or Discount, the provider agrees "not to offer, furnish or deliver any rebate, refund, preference…or other gratuitous consideration in connection with the provision of health care services…or to take any other action or receive any other benefit prohibited by state or federal law."  Id. at 4, Item 19. Finally, the provider agrees to comply with the Welfare and Institutions Code billing and claims requirements, its regulations, and the terms in the Medi-Cal provider manual.  Id. at 4, Item 24.

86.     The Colorado Medicaid Assistance Program "Provider Participation Agreement" requires the provider to "comply with applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines and Department rules."  Provider

Participation Agreement, Item A – Provider Participation, at 15, (available at Colorado Medicaid website and incorporated by reference herein).  Under Item K, the provider and person signing the claims or submitting electronic claims understand that "[T]he knowing submission of false claims or causing another to submit false claims may subject the persons responsible to criminal charges, civil penalties, and/or forfeitures."  *Id.* at 16.  Moreover, the "Provider Signature Page" states that by executing Colorado's Provider Agreement, the provider understands "that any false claims, statement, documents, or concealment of material fact may be …prosecuted under applicable federal and state laws."  *Id.* at 20.

87.     The Connecticut Medical Assistance Program Provider Enrollment Agreement requires the provider to "abide by and comply with all federal and state statutes, regulations, and policies pertaining to Provider's participation in the Connecticut Medical Assistance Program, as they may be amended from time to time." Provider Enrollment Agreement, Item 2 (available at the Connecticut Medicaid website and incorporated by reference herein). In addition, a provider is also required to certify that all services covered by the Connecticut Medical Assistance Program shall be provided "pursuant to all applicable federal and state statutes, regulations, and policies." *Id.* at Item 5.

88.     The State of Delaware requires providers to enter into a "Contract for Items or Services Delivered to Delaware Assistance Program Eligibles in the Department of Health and Social Services" with the Department of Health and Social Services, Division of Medicaid and Medical Assistance, Delaware Medical Assistance Program ("DMAP").  By signing the contract, the provider agrees to abide by and comply with DMAP's rules, regulations, policies and procedures as well as the terms of the Social Security Act.  Contract for Items or Services Delivered to Delaware Assistance Program Eligibles in the Department of Health and Social

Services, Section 1 Applicable Laws and Regulations, at 1, (available at the Delaware Medicaid website and incorporated by reference herein).  Furthermore, the provider's submission of any claim for payment will constitute certification by the provider that the items and services for which the claim for payment is submitted were in compliance with the DMAP rules, regulations, and policies, including certification that the services were actually provided and medically necessary.  Id. at 2, Section 3 Payment for Items or Services.

89.    A provider who signs the District of Columbia's "Department of Health Medical Assistance Administration Medicaid Provider Agreement" agrees "to satisfy all requirements of the Social Security Act, as amended, and be in full compliance with the standards prescribed by Federal and State standards."    Department of Health Medical Assistance Administration Medicaid Provider Agreement, General Provisions C, at 20 (available at the District of Columbia Medicaid website and incorporated by reference herein).

90.    The State of Florida's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for medical, medical-related, and waiver-related services provided to Medicaid recipients.  In order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify his or her understanding "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."  Florida Medicaid Provider Enrollment Application, Section VII Certification, at 9 (available at the Florida Medicaid website and incorporated herein).  Furthermore, Section 409.907 of Chapter 409, Social and Economic Assistance of the Florida Statutes, which governs Florida Medicaid provider agreements, provides that an individual or entity with a provider agreement in effect will only receive payment for services rendered to Medicaid recipients, if that provider is

"performing services or supplying the goods in accordance with federal, state and local laws…." Fla. Stat. § 409.907.

91.     In Hawaii, a health care provider signs the "Hawaii State Medicaid Program Provider Agreement and Condition of Participation" and agrees to abide by the applicable provisions of the Hawaii State Medicaid Program as set forth in the Hawaii Administrative Rules, Title 17, Subtitle 12 and the applicable provisions of the Code of Federal Regulations relating to the Medical Assistance Program.  Hawaii State Medicaid Program Provider Agreement and Condition of Participation, Section 1, at 5 (available at the Hawaii Medicaid website and incorporated herein).  Additionally, under Part C of the agreement, providers must certify their understanding that he or she may be suspended or terminated from participation in the Medicaid program for violations of the provisions of H.A.R. Subtitle 12, Chapter 17-1704 pertaining to Provider Fraud and Chapter 17-1736 pertaining to Provider Provisions.  Id. (Part C), at p. 7.

92.     Under the "Agreement for Participation" for the Illinois Medical Assistance Program, a provider who wishes to submit claims for services rendered to eligible Healthcare and Family Services clients agrees, on a continuing basis, to comply with "Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations."  State of Illinois Department of Healthcare and Family Services Agreement for Participation Illinois Medical Assistance Program, Item 3, at 1 (available at the Illinois Medicaid website and incorporated herein).  Moreover, the provider agrees "to be fully liable for the truth, accuracy and completeness of all claims submitted…to the Department for payment."  Id. at 1, Item 6.  Additionally, the Provider acknowledges that all services provided will be in compliance with such laws and the applicable provisions of the Illinois Healthcare and

Family Services Medical Assistance Program handbooks and that such compliance is "a condition of payment for all claims submitted." _Id._ The provider further agrees that "[A]ny submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws." _Id._

93.    When signing the "Indiana Health Coverage Programs Provider Agreement," a provider agrees "to comply with all federal and state statutes and regulations pertaining to the Indiana Health Coverage Programs, as they may be amended from time to time." IHCP Provider Agreement, at 17, Item 1 (available at the Indiana Medicaid website and incorporated herein). The provider also understands that "the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable federal and/or state laws." _Id._ at 19, Item 143. Moreover the provider agrees "[A]s a condition of payment…to abide by and comply with all the stipulations, conditions and terms set forth" in the agreement. _Id._ at p. 20. Furthermore, Indiana regulations state that a "provider who accepts payment of a claim submitted under the Medicaid program is considered to have agreed to comply with the statutes and rules governing the program."  Ind. Code § 12-15-21-1 (2011).

94.    The Louisiana Medical Assistance Program Integrity Law (MAPIL), codified in LSA-RS-46:437.1 – 46:440.3, statutorily establishes that the Louisiana Medicaid PE-50 Provider Enrollment Agreement is a contract between the provider and the Louisiana Department of Health and Hospitals.  The MAPIL provides that "the department shall make payments from the medical assistance funds…to any person who has a provider agreement with the department and who agrees to comply with all federal and state laws and rules pertaining to the medical assistance programs."  LSA-RS-46.437.11A. In addition, by signing the "PE-50 Addendum-Provider Agreement," the provider certifies that the provider understands all claims paid will be

from Federal and State Funds, and any false claims, statements or documents or concealment of fact may be prosecuted under applicable Federal and State laws.  PE-50 Addendum – Provider Agreement, at 2, Items 21 and 23 (available at the Louisiana Medicaid website and incorporated herein).

95.     In the Commonwealth of Massachusetts, pharmacies sign agreements with MassHealth, the Massachusetts Medicaid program.  The Commonwealth's regulations require "all pharmacies participating in MassHealth [to] comply with the regulations governing MassHealth, including but not limited to MassHealth regulations set forth in 130 CMR 406.00 and 450.00."  130 CMR 406.401.  The Commonwealth's regulations also state that MassHealth will pay for physician services provided to members, "subject to the restrictions and limitations described in the MassHealth regulations."  130 CMR 433.402.  MassHealth regulation 130 CMR 450.261 requires all providers to comply "with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, specifically including but not limited to 42 U.S.C. § 1320a-7b [the Federal Anti-Kickback Statute]."

96.     A provider agreeing to the Minnesota Health Care Program's "Provider Agreement" agrees to "comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services."  Minnesota Health Care Programs Provider Agreement, at 1, Item 2, (available at the Minnesota Medicaid website and incorporated herein).

97.     As part of the provider enrollment application for Montana Medicaid, the provider agrees to comply with "all applicable laws, rules and written policies pertaining to the Montana Medicaid Program including but not limited to Title XIX of the Social Security Act, the Code of Federal Regulations, Montana Codes Annotated, Administrative Rules of Montana and written

38

Department of Public Health and Human Services policies" in consideration of Medicaid payments made for services rendered. Montana Medicaid Provider Enrollment Application, at 4 (available at the Montana Medicaid website and incorporated herein).  Furthermore, the provider understands "THAT PAYMENTS OF CLAIMS WILL BE FROM FEDERAL AND STATE FUNDS AND THAT ANY FALSIFICATION OR CONCEALMENT OF A MATERIAL FACT MAY BE PROSECUTED UNDER FEDERAL AND STATE LAW."  *Id.* at 5 (capitalization in original).  Moreover, the Montana regulations require providers to "comply with all applicable state and federal statutes, rules and regulations, including but not limited to federal regulations and statutes found in Title 42 of the Code of Federal Regulations and the United States Code governing the Medicaid Program and all applicable Montana statutes and rules governing licensure and certification."  Mont. Admin. R. 37.85.401 (2011).

98.     In the "Nevada Medicaid and Nevada Check Up Provider Contract" with the Nevada Division of Health Care Financing and Policy, the Division agrees to only provide payment for services that are "timely claimed, and actually and properly rendered by Provider in accordance with federal and state law and the state policies and procedures set forth in the Medicaid Services Manual, Nevada Check Up Manual and Nevada Medicaid Billing Manual. Other claims are not properly payable Division claims."  Nevada Medicaid and Nevada Check Up Provider Contract, Section 2 – Reimbursement, at 2.  The provider is responsible for the validity and accuracy of submitted claims.  *Id.*

99.     In New Hampshire, the provider signs the "New Hampshire Medicaid Program Provider Enrollment Agreement" and certifies to "abide by all rules, regulations, billing manuals, and bulletins promulgated by the Department pertaining to the provision of care or services under NH Title XIX and the claiming of payments for those services."   New Hampshire

Medicaid Program Provider Enrollment Agreement, at 1, (available at the New Hampshire Medicaid website and incorporated herein).

100.    A provider signing a Medicaid provider enrollment agreement with the New Jersey Department of Health and Senior Services agrees "to comply with all applicable State and Federal Medicaid laws and policies, and rules and regulations promulgated pursuant thereto . . . ." and agrees "to comply with Section 1909 of P.L. 92-603, Section 242(c) which makes it a crime for persons found guilty of making any false statement or representation of a material fact in order to receive any benefit or payment under the Medicaid Assistance program…." Provider Agreement Between New Jersey Department of Health and Senior Service and Provider, at 1, Items 1 and 5 (available at the New Jersey Medicaid website and incorporated herein).

101.    When a provider signs the New Mexico "Medical Assistance Division Provider Participation Agreement, the provider "AGREES TO ABIDE BY AND BE HELD TO ALL FEDERAL, STATE, AND LOCAL LAWS, RULES AND REGULATIONS, INCLUDING, BUT NOT LIMITED TO THOSE PERTAINING TO MEDICAID AND THOSE STATED HEREIN." State of New Mexico Human Services Department Medical Assistance Division Provider Participation Agreement, at 6 (available at the New Mexico Medicaid website and incorporated herein) (capitalization in original).  Furthermore, the New Mexico regulations state, "A provider who furnishes services to a Medicaid eligible recipient agrees to comply with all federal and state laws, regulations, and executive orders relevant to the provision of services." N.M. Code R. § 8.302.1.11 (2011).

102.    Under the New York State Medicaid program's "Physician Request for Enrollment," a provider agrees to "comply with the rules, regulations, and official directives of

the Department …" <u>New York State Medicaid Physician Request for Enrollment</u>, at 5, (available at the New York Medicaid website and incorporated herein).

103.    Under North Carolina's "Provider Administrative Participation Agreement," a provider may submit claims to the state Medicaid program using an electronic or paper claims submission process.  As consideration for the right to submit paperless claims, the provider agrees to "abide by all Federal and State statutes, rules, regulations and policies…of the Medicaid program …."  By submitting electronic claims, the provider agrees that "[A]ny false statement, claims or concealment of or failure to disclose a material fact may be prosecuted under applicable federal and/or state law (P.L. 95-142a and N.C. G.S. 108A-63)…."  <u>North Carolina Medicaid Provider Enrollment Agreement, Electronic Claims Submission (ECS) Agreement</u>, at 1, Items 1 and 2, (available at the North Carolina Medicaid website and incorporated herein).  Additionally, the provider agrees when filing non-electronic Medicaid claims, that "payment of claims will be from federal, state and local tax funds and any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal and State laws …" <u>Id.</u>

104.    A provider signing the "State of Rhode Island Executive Office of Health and Human Services Provider Agreement Form" agrees to "follow all laws, rules, regulations, certification standards, policies and amendments including but not limited to the False Claims Act, and HIPAA, that govern the Rhode Island Medical Assistance Program as specified by the Federal Government and the State of Rhode Island."  <u>State of Rhode Island Executive Office of Health and Human Services Provider Agreement Form</u>, at 1, Item 1 (available at the Rhode Island Medicaid website and incorporated herein).

41

105.    In Tennessee, a provider enters the State of Tennessee's "Department of Finance and Administration Provider Participation Agreement Medicaid/TennCare Title XIX Program" in order to participate in the Tennessee Medicaid health care program.  A provider signing the agreement agrees to "comply with all contractual terms and Medicaid policies as outlined in Federal and State rules and regulations and Medicaid provider manuals and bulletins."  State of Tennessee The Department of Finance and Administration Provider Participation Agreement Medicaid/TennCare Title XIX Program, at 1, Item 7 (available at the Tennessee Medicaid website and incorporated herein).

106.    Medical services providers in the State of Vermont must sign a Provider Enrollment Agreement, which requires the provider to agree "to conform to all applicable Federal and State laws and regulations." Vermont Provider Enrollment/Recertification Agreement at p. 10 (available at the Vermont Medicaid website and incorporated herein).

107.    Providers of medical services in the Commonwealth of Virginia, including physicians and pharmacists, must also sign a participation agreement.  This agreement requires the provider to certify that when participating in the Virginia Medical Assistance Program the "provider agrees to comply with all applicable state and federal laws," including all administrative policies and procedures of the Virginia Medicaid Assistance Program. Commonwealth of Virginia Department of Medical Assistance Services Medical Assistance Program Participation Agreement, at 1, Item 8 (available at the Virginia Medicaid website and incorporated herein).

108.    When a provider enters into the State of Washington's "Core Provider Agreement" with the state's Department of Social and Health Services, the provider agrees "to abide by . . . all applicable federal and state statutes, rules, and policies. Core Provider

Agreement, Section 15 Certification, at 3, (available at the Washington Medicaid website and incorporated herein)  The certification signature page states that federal regulations require contractors and bidders to sign and abide by the terms of the certification, without modification, in order to participate in certain transactions directly or indirectly involving federal funds.  *Id.* at 12.

109.    In addition, every time they submit an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, providers also make express and/or implied certifications that they are complying with state and federal laws applicable to the Medicaid program and that there has not been a material omission.  Florida Medicaid's provider enrollment form, for instance, includes a notice regarding the certifications to be contained in electronic submissions:

> Providers who choose to submit claims electronically, including pharmacies that use Point of Service (POS) devices, must be aware that payment of claims will be from federal and state funds and that any falsification or concealment of material fact may be prosecuted under Federal and State laws. Further, providers must understand and agree to the following:
> …
> Abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program.[10]

110.    These certifications are "essentially identical" from state to state,[11] and their particulars are a matter of public record.  In *United States ex rel. Quinn v. Omnicare Inc.*, for example, the court explained how this process works in the pharmacy context in New Jersey:

> After a Medicaid-provider pharmacy has supplied a medication to a Medicaid patient, the pharmacy submits a claim to Medicaid. Medicaid then pays the

---

[10] Florida Medicaid Provider Enrollment Application at http://portal.flmmis.com/FLPublic/Portals/0/StaticContent/Public/Public%20Misc%20Files/December%202004%20App%20EDS%20Web%20Version%20062508.pdf, section 22, page 5 (*accessed* September 14, 2015).

[11] See Common Opposition of the United States and the Intervening States to Johnson & Johnson's Motion to Dismiss, filed Aug. 6, 2010 in *United States ex rel. Lisitza v. Johnson & Johnson,* No. 1:07-cv-10288-RGS (Dist. Mass.) at 10.

pharmacy for the medication. Instructions for filing Medicaid claims are set forth in New Jersey Medicaid's Pharmacy Services Fiscal Agent Billing Supplement (FABS). FABS instructs provider pharmacies to submit Medicaid pharmacy claims on the MC-6 form. The MC-6 claim form contains a "Provider Certification" which the provider must sign: I certify that the services covered by this claim were personally rendered by me or under my direct supervision ... and that the services covered by this claim and the amount charged thereof are in accordance with the regulations of the New Jersey Health Services Program; and that no part of the net amount payable under this claim has been paid; and that payment of such amount will be accepted as payment in full without additional charge to the patient or to others on his behalf.... I understand that ... any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable federal or State law, or both.

*United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 434-35 (3d Cir. 2004).

111.    Given the structure of the health care systems at issue, and given the Defendants' false statements and representations, and given the false records that the Defendants made, used, or caused to be made or used, Defendants' conduct has the potential to influence the government's payment decision.

112.    The ultimate submission by the retail pharmacies of false pharmaceutical claims to the state Medicaid programs was a foreseeable factor in the Government's loss and a consequence of the scheme.  Consequently, the states and the United States Government have suffered substantial damages.

### 3.    Conspiracy to Defraud the Government In Violation of the FCA (31 U.S.C. § 3729(a)(3); 31 U.S.C. 3729(a)(1)(C))

113.    The Defendants and their retail pharmacy customers conspired with one another to submit false claims for reimbursement for Enoxaparin to public health care programs, including Medicaid, and to receive reimbursement to which they were not entitled.

114.    As part of the scheme and agreement to obtain reimbursement for Enoxaparin, Defendants provided fraudulent prices to the Publishers knowing that the Government relied on those prices to establish reimbursement rates for Enoxaparin.  The Defendants then offered retail

pharmacy customers significant discounts in the price for Enoxaparin.  The Defendants and their retail pharmacy customers realized larger profits as a result.

115.    Given the structure of the health care systems at issue, and given Defendants' conspiracies with retail pharmacy customers regarding the price for Enoxaparin, the Defendants' conduct has the potential to influence the Government's payment decisions.

116.    The ultimate submission by the retail pharmacies of false and/or fraudulent pharmaceutical claims to public health care programs, including state Medicaid programs, was a foreseeable factor in the Government's loss and a consequence of the scheme.  Consequently, the states and the United States Government have suffered substantial damages.

## XI.    CAUSES OF ACTION

### A.    Count I – False Claims (31 U.S.C. § 3729(a); 31 U.S.C. § 3729(a)(1)(A))

117.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

118.    As a result of Defendants' pricing schemes and kickbacks to retail pharmacists to induce them to purchase Enoxaparin, all of the claims for Enoxaparin that Defendants caused pharmacists to submit to public health care programs, including state Medicaid programs, are false and/or fraudulent.  The Defendants knowingly caused such false or fraudulent claims to be presented for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)).

119.    The United States paid the false and/or fraudulent claims.

120.    By virtue of the false or fraudulent claims that Defendants knowingly presented or caused to be presented, the United States government has suffered substantial monetary damages.

B.      **Count II – False Records or Statements (31 U.S.C. § 3729(a); 31 U.S.C. § 3729(a)(1)(B))**

121.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

122.    As a result of Defendants' pricing schemes and kickbacks to retail pharmacists, Defendants knowingly made or used, or caused to be made or used, false records or statements and omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a); 31 U.S.C. § 3729(a)(1)(B).   These false statements or records consist of false certifications or representations made or caused to be made by Defendants to public health care programs when seeking to participate in the various programs.   Additionally, Defendants made or caused to be made false representations regarding the Defendants' generic drugs when they reported false and fraudulent prices to the Publishers, knowing that public health care programs used such prices to establish the EAC or MAC on which reimbursements were based.   Each claim for the Enoxaparin NDCs at issue in this case that were submitted to the Government for reimbursement represents a false and/or fraudulent claim for payment.

123.    The Defendants further knowingly caused their retail pharmacy customers to make or use false records or statements (a) to get false or fraudulent claims paid or approved by the Government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a); 31 U.S.C. § 3729(a)(1)(B).   Each time a retail pharmacy submitted an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, its pharmacist made express and/or implied certifications that the pharmacy was complying with state and federal laws applicable to the Medicaid program and that there has not been a material omission.   The Defendants caused retail pharmacists to falsely represent

46

compliance with these laws when they submitted claims to state Medicaid programs for reimbursement for the Enoxaparin NDCs at issue in this case.

124.    By virtue of the false records or statements that Defendants made or used, the United States Government has suffered substantial monetary damages.

C.    **Count III – Conspiracy to defraud Government (31 U.S.C. § 3729(a)(3); 31 U.S.C. 3729(a)(1)(C))**

125.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

126.    The Defendants conspired with their retail pharmacy customers by offering these customers significantly lower prices for Enoxaparin to induce them to purchase it, while the Defendants reported false and fraudulent prices to the Publishers knowing that Medicaid relied on such prices to establish reimbursement rates for Enoxaparin.  By agreeing to the financial incentive of this price spread scheme, in violation of the Anti-Kickback Statute, Defendants and their retail pharmacy customers caused all the claims submitted by such customers to Medicaid for the Enoxaparin NDCs at issue in this case to be false and fraudulent.  Accordingly, Defendants and their retail pharmacy customers conspired to defraud the United States by (a) getting false or fraudulent claims allowed or paid, or (b) committing a violation of 31 U.S.C. § 3729(a), in violation of 31 U.S.C. § 3729(a).

127.    By virtue of the conspiracy between Defendants and their retail pharmacy customers to submit false claims for reimbursement for the Enoxaparin NDCs at issue in this case to state Medicaid programs and to receive reimbursement based on those false claims in violation of 31 U.S.C. §3729(a)(3); 31 U.S.C. 3729(a)(1)(C), the Government has suffered substantial monetary damages.

**RELIEF**

47

128.     On behalf of the United States Government, Relator seeks to receive monetary damages equal to three times that suffered by the United States Government. In addition, Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

129.     Relator seeks an award totaling the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

130.     Relator seeks an award for all costs and expenses for this action, including attorneys' fees and court costs.

131.     Relator seeks pre-judgment interest at the highest rate allowed by law.

### PRAYER

132.     WHEREFORE, Relator prays for judgment in his favor and against Defendants for the following:

- Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

- Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

- The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

- All costs and expenses of this litigation, including attorneys' fees and costs of court;

- Relator's individual damages;

- Pre-judgment interest at the highest rate allowed by law; and

▪ All other relief on Relator's behalf or on behalf of the United States Government to which they may be entitled and that the Court deems just and proper.

### D.  Count IV – California False Claims Act

133.  Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

134.  This is a *qui tam* action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq*.

135.  Cal. Gov't Code § 12651(a) provides liability for any person who-

(1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3)    Conspires to commit a violation of this subdivision.

\*\*\*

(7)    Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

136.  In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

137.  Defendants have knowingly violated Cal. Gov't Code § 12651(a) by violating the Federal Anti-Kickback Statute and the California Anti-Kickback Statutes (Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf. & Inst. Code §14107.2), as described herein.

138.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Medi-Cal program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to Medi-Cal, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state's Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the California Anti-Kickback Statutes (Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf. & Inst. Code §14107.2).  Compliance with federal and state laws and regulations were conditions of payment.

139.    The State of California, by and through the California Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

140.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of California's payment decision.

141.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of California's loss, and a consequence of the scheme.

142.    As a result of the Defendants' violations of Cal. Gov't Code §12651(a), the State of California has been damaged.

143.    There are no bars to recovery under Cal. Gov't Code §12652(d)(3), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on

his own behalf and on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of California before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of California on November 4, 2015.

144.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of California.

145.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CALIFORNIA:

    (1)    Three times the amount of actual damages that the State of California has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of no less than $5,500 and no more than $11,000 for each false claim that Defendants presented or caused to be presented to the State of California;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**E.     Count V – Colorado Medicaid False Claims Act**

146.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

147.     This is a *qui tam* action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Col. Rev. Stat. Ann. § 25.5-4-304 *et seq.*

148.     Col. Rev. Stat. Ann. §25.5-4-305(1) provides liability for any person who

(a)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\*\*\*

f)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

g)     Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

149.     The Defendants have knowingly violated Col. Rev. Stat. Ann. §25.5-4-305 by violating the Federal Anti-Kickback Statute, as described herein.

150.     As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Colorado Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Colorado Medicaid

program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state's Medicaid program. Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute. Compliance with federal and state laws and regulations were conditions of payment.

151.    The State of Colorado, by and through the Colorado Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

152.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Colorado's payment decision.

153.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Colorado's loss, and a consequence of the scheme.

154.    As a result of Defendants' violations of Col. Rev. Stat. Ann. §25.5-4-305, the State of Colorado has been damaged.

155.    There are no bars to recovery under Col. Rev. Stat. Ann. §25.5-4-306, and, or in the alternative, Relator is an original source as defined therein. Relator has brought this action on his own behalf and on behalf of the State of Colorado pursuant to Col. Rev. Stat. Ann. §25.5-4-306(2). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Colorado before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Colorado on November 4, 2015.

156.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Colorado.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF COLORADO:

(1)    Three times the amount of actual damages that the State of Colorado has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Colorado;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to Col. Rev. Stat. Ann. §25.5-4-306 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**F.      Count VI – Connecticut False Claims Act**

157.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

158.    This is a *qui tam* action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. Sec. 4-274 *et seq.*

159.    Conn. Gen. Stat. 4-275(a) provides that no person shall:

(3)     Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

(4)     Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

(5)     Conspire to commit a violation of this section;

\*\*\*

(7)     Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program

160.    Defendants have knowingly violated Conn. Gen. Stat. 4-275(a) by violating the Federal Anti-Kickback Statute and the Connecticut laws prohibiting kickbacks (Conn. Gen Stat. §§ 53a-161c, 53a-161d), as described herein.

161.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Connecticut Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Connecticut Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state's Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Connecticut laws prohibiting kickbacks (Conn. Gen Stat. §§ 53a-161c, 53a-161d).  Compliance with federal and state laws and regulations were conditions of payment.

162.    The State of Connecticut, by and through the medical assistance programs administered by the Connecticut Department of Social Services, paid the false and/or fraudulent claims.

163.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Connecticut's payment decision.

164.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Connecticut's loss, and a consequence of the scheme.

165.    As a result of the Defendants' violations of Conn. Gen. Stat. § 4-275(a), the State of Connecticut has been damaged.

166.    There are no bars to recovery under Conn. Gen. Stat. § 4-282, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Connecticut pursuant to Conn. Gen. Stat. § 4-277. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Connecticut before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Connecticut on November 4, 2015.

167.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Connecticut.

168.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CONNECTICUT:

 (1) Three times the amount of actual damages that the State of Connecticut has sustained as a result of the fraudulent and illegal practices of the Defendants;

 (2) A civil penalty of no less than $5,500 and up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Connecticut;

 (3) Prejudgment interest; and

 (4) All costs incurred in bringing this action.

To RELATOR:

 (1) The maximum amount allowed pursuant to Conn. Gen. Stat. § 4-278(e) and/or any other applicable provision of law;

 (2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

 (3) An award of reasonable attorneys' fees and costs; and

 (4) Such further relief as this Court deems equitable and just.

## G. Count VII - Delaware False Claims and Reporting Act

169. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

170. This is a *qui tam* action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. C. 6 § 1201 *et seq.*

171. Del. C. 6 § 1201(a) provides that no person shall-

 (1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

 (2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

57

      (3)      Conspire to commit a violation of this section;

      ***

      (7)      Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program.

172.    The Defendants have knowingly violated Del. C. 6 § 1201(a) by violating the Federal Anti-Kickback Statute and the Delaware Anti-Kickback Statute (Del. C. 31 § 1005), as described herein.

173.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Delaware Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Delaware Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and Delaware Anti-Kickback Statute (Del. C. 31 § 1005).  Compliance with federal and state laws and regulations were conditions of payment.

174.    The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

175.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Delaware's payment decision.

58

176.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Delaware's loss, and a consequence of the scheme.

177.     As a result of the Defendants' violations of Del. C. 6 § 1201(a), the State of Delaware has been damaged.

178.     There are no bars to recovery under Del. C. 6 § 1206, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Delaware pursuant to Del. C. 6 § 1203. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Delaware before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Delaware on November 4, 2015.

179.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Delaware.

180.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF DELAWARE:

(1)     Three times the amount of actual damages that the State of Delaware has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Delaware;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

    (1)     The maximum amount allowed pursuant to Del. C. 6 § 1205, and/or any other applicable provision of law;

    (2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)     An award of reasonable attorneys' fees and costs; and

    (4)     Such further relief as this Court deems equitable and just.

**H.     Count VIII – District of Columbia False Claims Act**

181.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

182.    This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.*

183.    D.C. Code § 2-381.02(a) provides liability for any person who-

    (1)     Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

    (2)     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

    ***

    (6)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

    (7)     Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection.

184.    The Defendants have knowingly violated D.C. Code § 2-381.02(a) by violating the Federal Anti-Kickback Statute and the District of Columbia Anti-Kickback Statute (D.C. Code § 4-802), as described herein.

185.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the District of Columbia Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the District of Columbia Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the District of Columbia Anti-Kickback Statute (D.C. Code § 4-802).   Compliance with federal and state laws and regulations were conditions of payment.

186.    The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

187.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the District of Columbia's payment decision.

188.    The ultimate submission by the retail pharmacies of false claims to the District of Columbia's Medicaid program was a foreseeable factor in the District of Columbia's loss, and a consequence of the scheme.

189.    As a result of the Defendants' violations of D.C. Code § 2-381.02(a), the District of Columbia has been damaged.

190.    There are no bars to recovery under D.C. Code §2-381.03, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the District of Columbia pursuant to D.C. Code §2-381.03. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the District of Columbia before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the District of Columbia on November 4, 2015.

191.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the District of Columbia.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the DISTRICT OF COLUMBIA:

(1)    Three times the amount of actual damages that the District of Columbia has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of no less than $5,500 and no more than $11,000 for each false claim that the Defendants presented or caused to be presented to the District of Columbia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to D.C. Code § 2-381.03(f) and/or any other applicable provision of law;

62

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

I.     **Count IX – Florida False Claims Act**

192.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

193.    This is a *qui tam* action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

194.    Fla. Stat. § 68.082(2) provides liability for any person who-

a)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

b)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

c)     Conspires to commit a violation of this subsection;

***

g)     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

195.    Defendants have knowingly violated Fla. Stat. § 68.082(2) by violating the Federal Anti-Kickback Statute and the Florida Anti-Kickback Statute (Fla. Stat. § 409.920), as described herein.

196.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Florida Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the

state by not reporting the correct AWP or WAC to the Florida Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Florida Anti-Kickback Statute (Fla. Stat. § 409.920).  Compliance with federal and state laws and regulations were conditions of payment.

197.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, paid the false and/or fraudulent claims.

198.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Florida's payment decision.

199.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Florida's loss, and a consequence of the scheme.

200.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged.

201.    There are no bars to recovery under Fla. Stat. § 68.087(3), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Florida pursuant to Fla. Stat. § 68.083. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Florida before filing an action based on the

information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Florida on November 4, 2015.

202.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Florida.

203.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF FLORIDA:

(1)    Three times the amount of actual damages that the State of Florida has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Florida;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**J.    Count X – Georgia False Medicaid Claims Act**

204.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

205.     This is a *qui tam* action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Georgia Code Ann. § 49-4-168 *et seq.*

206.     Georgia Code Ann. § 49-4-168.1(a) provides liability for any person who:

(1)     Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)     Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;

\*\*\*

(7)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

207.     Defendants have knowingly violated Georgia Code Ann. § 49-4-168.1 by violating the Federal Anti-Kickback Statute, as described herein.

208.     As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Georgia Medicaid program are false or fraudulent. Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Georgia Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program. Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not

66

limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

209.   The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

210.   Given the structure of the health care systems, the false statements, representations, and/or records made by Defendants had the potential to influence the State of Georgia's payment decision.

211.   The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Georgia's loss, and a consequence of the scheme.

212.   As a result of Defendants' violations of Georgia Code Ann. § 49-4-168.1, the State of Georgia has been damaged.

213.   There are no bars to recovery under Georgia Code Ann. § 49-4-168.2, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Georgia pursuant to Georgia Code Ann. § 49-4-168.2. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Georgia before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Georgia on November 4, 2015.

214.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Georgia.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF GEORGIA:

(1)     Three times the amount of actual damages that the State of Georgia has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Georgia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to Georgia Code Ann. § 49-4-168.2 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**K.      Count XI – Hawaii False Claims Act**

215.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

216.    This is a *qui tam* action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.

217.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

(1)     Knowingly presents, or causes to be presented, a false or-fraudulent claim for payment or approval;

68

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\*\*\*

(6)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State;

(8)     Conspires to commit any of the conduct described in this subsection, shall be liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages that the State sustains due to the act of that person.

218.    Defendants have knowingly violated Haw. Rev. Stat. §661-21(a) by violating the Federal Anti-Kickback Statute and the Hawaii Anti-Kickback Statute (Haw. Rev. Stat. § 346-43.5), as described herein.

219.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Hawaii Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Hawaii Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Hawaii Anti-Kickback Statute (Haw. Rev. Stat. § 346-43.5).  Compliance with federal and state laws and regulations were conditions of payment.

220.    The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

69

221.   Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Hawaii's payment decision.

222.   The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Hawaii's loss, and a consequence of the scheme.

223.   As a result of the Defendants' violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged.

224.   There are no bars to recovery under Haw. Rev. Stat. § 661-31, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Hawaii pursuant to Haw. Rev. Stat. § 661-25. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Hawaii before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Hawaii on November 4, 2015.

225.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Hawaii.

226.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF HAWAII:

(1)   Three times the amount of actual damages that the State of Hawaii has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Hawaii;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**L.    Count XII – Illinois False Claims Act**

227.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

228.    This is a *qui tam* action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175 *et seq*.

229.    740 Ill. Comp. Stat. 175/3(a)(1) provides liability for any person who-

a)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

b)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

c)    Conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

\*\*\*

g)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit

money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

230.     Defendants have knowingly violated 740 Ill. Comp. Stat. 175/3(a) by violating the Federal Anti-Kickback Statute and the Illinois Anti-Kickback Statute (305 Ill. Comp. Stat. 5/8A-3(b)), as described herein.

231.     As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Illinois Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Illinois Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the Illinois Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Illinois Anti-Kickback Statute (305 Ill. Comp. Stat. 5/8A-3(b)).  Compliance with federal and state laws and regulations were conditions of payment.

232.     The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

233.     Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Illinois's payment decision.

234.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Illinois's loss, and a consequence of the scheme.

235.    As a result of the Defendants' violations of 740 Ill. Comp. Stat. 175/3(a), the State of Illinois has been damaged.

236.    There are no bars to recovery under 740 Ill. Comp. Stat. 175/4, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Illinois before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Illinois on November 4, 2015.

237.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Illinois.

238.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF ILLINOIS:

(1)    Three times the amount of actual damages that the State of Illinois has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Illinois;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to 740 Ill. Comp. Stat. 175/4(d) and/or any other applicable provision of law;

73

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**M.     Count XIII – Indiana Medicaid False Claims and Whistleblower Protection Act**

239.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

240.    This is a *qui tam* action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.7 *et seq*.

241.    Ind. Code §5-11-5.7-2(a) provides liability for any person who-

(1)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim;

        ***

(6)     Knowingly:

        (A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or

        ***

(7)     Conspires with another person to perform an act described in subdivisions (1) through (6); or

(8)     Causes or induces another person to perform an act described in subdivisions (1) through (6)

74

242.    Defendants have knowingly violated Ind. Code §5-11-5.7-2(a) by violating the Federal Anti-Kickback Statute and the Indiana Anti-Kickback Statute (Ind. Code § 12-15-24-2), as described herein.

243.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Indiana Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Indiana Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Indiana Anti-Kickback Statute (Ind. Code § 12-15-24-2).  Compliance with federal and state laws and regulations were conditions of payment.

244.    The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

245.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Indiana's payment decision.

246.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Indiana's loss, and a consequence of the scheme.

247.    As a result of Defendants' violations of Ind. Code § 5-11-5.7-2(a), the State of Indiana has been damaged.

248.    There are no bars to recovery under Ind. Code § 5-11-5.7-6.  Relator has brought

this action on his own behalf and on behalf of the State of Indiana pursuant to Ind. Code § 5-11-

5.7-4.  Relator has direct and independent knowledge of the information on which these

allegations are based and has voluntarily provided the information to the State of Indiana before

filing an action based on the information.  Relator submitted a pre-filing disclosure and

referenced exhibits to the Attorney General of the State of Indiana on November 4, 2015.

249.    This Court is requested to accept pendent jurisdiction of this related state claim as

it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage

to the State of Indiana.

250.    WHEREFORE, Relator respectfully requests this Court to award the following

damages to the following parties and against the Defendants:

To the STATE OF INDIANA:

(1)    Three times the amount of actual damages that the State of Indiana has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Indiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to Ind. Code §5-11-5.7-6 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)      Such further relief as this Court deems equitable and just.

**N.      Count XIV – Iowa False Claims Act**

251.      Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

252.      This is a *qui tam* action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code Ann. § 685.1 *et seq.*

253.      Iowa Code Ann. § 685.2(1) provides liability for any person who:

(a)      Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(b)      Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(c)      Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g."

***

(g)      Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

254.      The Defendants have knowingly violated Iowa Code Ann. § 685.2(1) by their violation of federal and state laws, including the Federal Anti-Kickback Statute, as described herein.

255.      As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Iowa Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Iowa Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to

falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute. Compliance with federal and state laws and regulations were conditions of payment.

256.   The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

257.   Given the structure of the health care systems, the false statements, representations, and records made by the Defendants had the potential to influence the State of Iowa's payment decision.

258.   The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Iowa's loss and a consequence of the scheme.

259.   As a result of the Defendants' violations of Iowa Code Ann. § 685.2(1), the State of Iowa has been damaged.

260.   There are no bars to recovery under Iowa Code Ann. § 685.3 and, or in the alternative, Relator is an original source as defined under Iowa Code Ann. § 685.1. Relator has brought this action on his own behalf and on behalf of the State of Iowa pursuant to Iowa Code Ann. § 685.3. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Iowa before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Iowa on November 4, 2015.

261.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Iowa.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF IOWA:

- Three times the amount of actual damages that the State of Iowa has sustained as a result of the fraudulent and illegal practices of the Defendants;

- A civil penalty of not less than $5,000 for each false claim that the Defendants presented or caused to be presented to the State of Iowa;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Iowa Code Ann. § 685.3(4) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses that Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**O.    Count XV – Louisiana Medical Assistance Programs Integrity Law**

262.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

263.    This is a *qui tam* action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*

264.    La. Rev. Stat. Ann. § 46:438.3 provides -

    A.    No person shall knowingly present or cause to be presented a false or fraudulent claim.

    B.    No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

    C.    No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

    D.    No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

265.    Defendants have knowingly violated La. Rev. Stat. Ann. § 46:438.3 by violating the Federal Anti-Kickback Statute and the Louisiana Anti-Kickback Statute (La. Rev. Stat. Ann. § 46:438.2(A)), as described herein.

266.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Louisiana Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Louisiana Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Louisiana Anti-Kickback Statute (La. Rev. Stat. Ann. § 46:438.2(A)).  Compliance with federal and state laws and regulations were conditions of payment.

80

267.    The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

268.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Louisiana's payment decision.

269.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Louisiana's loss, and a consequence of the scheme.

270.    As a result of Defendants' violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged.

271.    There are no bars to recovery under La. Rev. Stat. Ann. § 46:439.1(E), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Louisiana before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Louisiana on November 4, 2015.

272.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Louisiana.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF LOUISIANA:

(1)     Three times the amount of actual damages that the State of Louisiana has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Louisiana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to La. Rev. Stat. § 46:439.4(A) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**P.     Count XVI – Maryland False Claims Act**

273.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

274.    This is a *qui tam* action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann. Health-Gen. §2-601 *et seq.*

275.    Md. Code Ann. Health-Gen. §2-602(a) provides that a person may not:

1.      Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

2.      Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

3.      Conspire to commit a violation under this subtitle;

***

7.    Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

\*\*\*

9.    Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

276.    Defendants have knowingly violated Md. Code Ann. Health-Gen. §2-602 by violating the Federal Anti-Kickback Statute, as described herein.

277.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Maryland Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Maryland Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

278.    The State of Maryland, by and through the Maryland Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

279.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Maryland's payment decision.

280.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Maryland's loss, and a consequence of the scheme.

281.    As a result of the Defendants' violations of Md. Code Ann. Health-Gen. §2-602, the State of Maryland has been damaged.

282.    Relator has brought this action pursuant to Md. Code Ann. Health-Gen. §2-604(a) on behalf of himself and on behalf of the State of Maryland. There are no bars to recovery under Md. Code Ann. Health-Gen. §2-606. In the alternative, Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the State of Maryland before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Maryland on November 4, 2015.

283.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Maryland in the operation of its Medicaid program.

284.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MARYLAND:

(1)    Three times the amount of actual damages that the State of Maryland has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of up to $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Maryland;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

84

To Relator:

  (1) The maximum amount allowed pursuant to Md. Code Ann. Health-Gen. §2-602 and/or any other applicable provision of law;

  (2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

  (3) An award of reasonable attorneys' fees and costs; and

  (4) Such further relief as this Court deems equitable and just.

**Q. Count XVII – Massachusetts False Claims Act**

285. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

286. This is a *qui tam* action brought by Relator and the Commonwealth of Massachusetts for treble damages and penalties under the Massachusetts False Claims Act, Mass. Gen. Laws Ann. 12 § 5A *et seq.*

287. Mass. Gen. Laws Ann. 12 § 5B provides liability for any person who-

  (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

  (2) Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

  (3) Conspires to commit a violation of this subsection;

  (4) Knowingly presents, or causes to be presented, a claim that includes items or services resulting from a violation of section 1128B of the Social Security Act, 42 U.S.C. 1320a-7b, or section 41 of chapter 118E;

  ***

  (9) Knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof.

85

288.    Defendants have knowingly violated Mass. Gen. Laws Ann. 12 § 5B by violating the Federal Anti-Kickback Statute and the Massachusetts Anti-Kickback Statute (Mass. Gen. Laws Ann. 118E §41), as described herein.

289.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to MassHealth, the Massachusetts Medicaid program, are false or fraudulent.   Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to MassHealth, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to MassHealth.   Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Massachusetts Anti-Kickback Statute (Mass. Gen. Laws Ann. 118E §41).   Compliance with federal and state laws and regulations were conditions of payment.

290.    The Commonwealth of Massachusetts, by and through MassHealth and other state health care programs, paid the false and/or fraudulent claims.

291.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the Commonwealth of Massachusetts's payment decision.

292.    The ultimate submission by the retail pharmacies of false claims to MassHealth and other state health care programs was a foreseeable factor in the Commonwealth of Massachusetts's loss, and a consequence of the scheme.

293.    As a result of the Defendants' violations of Mass. Gen. Laws Ann. 12 § 5B, the Commonwealth of Massachusetts has been damaged.

86

294.     There are no bars to recovery under Mass. Gen. Laws Ann. 12 § 5G, and, or in the alternative, Relator is an original source as defined in Mass. Gen. Laws Ann. 12 § 5A.  Relator has brought this action on his own behalf and on behalf of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws Ann. 12 § 5C(2). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the Commonwealth of Massachusetts before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the Commonwealth of Massachusetts on November 4, 2015.

295.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the Commonwealth of Massachusetts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the COMMONWEALTH OF MASSACHUSETTS:

(1)     Three times the amount of actual damages that the Commonwealth of Massachusetts has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the Commonwealth of Massachusetts;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to Mass. Gen. Laws Ann.12, §5F and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

### R.     Count XVIII – Michigan Medicaid False Claim Act

296.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

297.    This is a *qui tam* action brought by Relator and the State of Michigan for treble damages and penalties under the Michigan Medicaid False Claim Act, Mich. Comp. L. § 400.601 *et seq.*

298.    The Michigan Medicaid False Claim Act contains the following provisions:

- A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.
  (Mich. Comp. L. § 400.603(2))

- A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws.
  (Mich. Comp. L. § 400.606(1))

- A person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false.
  (Mich. Comp. L. § 400.607(1))

299.    Defendants have knowingly violated Mich. Comp. L. §§ 400.603(2), 400.606(1) and 400.607(1) by violating the Federal Anti-Kickback Statute and the Michigan Anti-Kickback Statute (Mich. Comp. Laws § 400.604), as described herein.

88

300.     As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Michigan Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Michigan Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Michigan Anti-Kickback Statute (Mich. Comp. Laws § 400.604).  Compliance with federal and state laws and regulations were conditions of payment.

301.     The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

302.     Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Michigan's payment decision.

303.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Michigan's loss, and a consequence of the scheme.

304.     As a result of the Defendants' violations of Mich. Comp. L. §§ 400.603(2), 400.606(1) and 400.607(1), the State of Michigan has been damaged.

305.     There are no bars to recovery under Mich. Comp. L. § 400.610a, and, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on

his own behalf and on behalf of the State of Michigan pursuant to Mich. Comp. L. § 400.610a. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Michigan Attorney General's Office before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Michigan on November 4, 2015.

306.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Michigan.

307.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MICHIGAN:

> (1)    Three times the amount of actual damages that the State of Michigan has sustained as a result of the fraudulent and illegal practices of the Defendants;

> (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Michigan;

> (3)    Prejudgment interest; and

> (4)    All costs incurred in bringing this action.

To RELATOR:

> (1)    The maximum amount allowed pursuant to Mich. Comp. L.  §400.610a(9) and/or any other applicable provision of law;

> (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

> (3)    An award of reasonable attorneys' fees and costs; and

> (4)    Such further relief as this Court deems equitable and just.

S.      **Count XIX – Minnesota False Claims Act**

308.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

309.    This is a *qui tam* action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. Ann. § 15C.01 *et seq.*

310.    Minn. Stat. Ann. § 15C.02(a) imposes liability on any person who

   (a)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

   (b)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

   (c)    Knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

   ***

   (7)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Minnesota, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State of Minnesota.

311.    Defendants have knowingly violated Minn. Stat. Ann. § 15C.02 by violating the Federal Anti-Kickback Statute, as described herein.

312.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Minnesota Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Minnesota Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to

91

falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute. Compliance with federal and state laws and regulations were conditions of payment.

313.    The State of Minnesota, by and through the Minnesota Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

314.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Minnesota's payment decision.

315.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of Minnesota's loss, and a consequence of the scheme.

316.    As a result of the Defendants' violations of Minn. Stat. Ann. § 15C.02, the State of Minnesota has been damaged.

317.    There are no bars to recovery under Minn. Stat. Ann. § 15C.05, or in the alternative, Relator is an original source as defined in Minn. Stat. Ann. §15C.01. Relator has brought this action on his own behalf and on behalf of the State of Minnesota pursuant to Minn. Stat. Ann. § 15C.05. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Minnesota before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Minnesota on November 4, 2015.

318.   This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Minnesota.

319.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MINNESOTA:

> (1)   Three times the amount of actual damages that the State of Minnesota has sustained as a result of the fraudulent and illegal practices of the Defendants;

> (2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Minnesota;

> (3)   Prejudgment interest; and

> (4)   All costs incurred in bringing this action.

To RELATOR:

> (1)   The maximum amount allowed pursuant to Minn. Stat. Ann. § 15C.13 and/or any other applicable provision of law;

> (2)   Reimbursement for reasonable expenses that Relator incurred in connection with this action;

> (3)   An award of reasonable attorneys' fees and costs; and

> (4)   Such further relief as this Court deems equitable and just.

**T.    Count XX – Montana False Claims Act**

320.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

321.   This is a *qui tam* action brought by Relator and the State of Montana for treble damages and penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

322.   Mont. Code Ann. § 17-8-403(1) provides liability for any person who-

(a)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c)     Conspires to commit a violation of this subsection (1);

***

(g)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity.

323.   Defendants have knowingly violated Mont. Code Ann. § 17-8-403(1) by violating the Federal Anti-Kickback Statute and the Montana Anti-Kickback Statute (Mont. Code Ann § 45-6-313), as described herein.

324.   As a result of Defendants' pricing schemes, all of the claims that Defendant caused their retail pharmacy customers to knowingly submit to the Montana Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Montana Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Montana Anti-Kickback Statute (Mont. Code Ann § 45-6-313). Compliance with federal and state laws and regulations were conditions of payment.

325.   The State of Montana, by and through the Montana Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

94

326.   Given the structure of the health care systems, the false statements, representations, and/or records made by Defendants had the potential to influence the State of Montana's payment decision.

327.   The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Montana's loss, and a consequence of the scheme.

328.   As a result of the Defendants' violations of Mont. Code Ann. § 17-8-403(1), the State of Montana has been damaged.

329.   There are no bars to recovery under Mont. Code Ann. § 17-8-403(6), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Montana pursuant to Mont. Code Ann. § 17-8-406. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Montana before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Montana on November 4, 2015.

330.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Montana.

331.   WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against the Defendants:

To the STATE OF MONTANA:

> (1)    Three times the amount of actual damages that the State of Montana has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Montana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to Mont. Code Ann. § 17-8-410 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**U.      Count XXI – Nevada False Claims Act**

332.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

333.     This is a *qui tam* action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada law governing the Submission of False Claims to State or Local Governments, N.R.S. § 357.010, *et seq.*

334.     N.R.S. § 357.040(1) provides liability, regardless of whether or not there is intent to defraud, for any person who-

(a)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b)     Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

\*\*\*

(f)     Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

96

(g)     Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

\*\*\*

(i)     Conspires to commit any of the acts set forth in this subsection.

335.    The Defendants have knowingly violated N.R.S. § 357.040(1) by violating the Federal Anti-Kickback Statute and the Nevada Anti-Kickback Statute (N.R.S. § 422.560), as described herein.

336.    As a result of the Defendants' pricing schemes, all of the claims that the Defendants caused their retail pharmacy customers to knowingly submit to the Nevada Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Nevada Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Nevada Anti-Kickback Statute (N.R.S. § 422.560). Compliance with federal and state laws and regulations were conditions of payment.

337.    The State of Nevada, by and through the Nevada Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

338.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Nevada's payment decision.

339.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Nevada's loss, and a consequence of the scheme.

340.    As a result of the Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged.

341.    There are no bars to recovery under N.R.S. § 357.100, and, or in the alternative, Relator is an original source as defined in N.R.S. § 357.026.  Relator has brought this action on his own behalf and on behalf of the State of Nevada pursuant to N.R.S. § 357.080(1). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Nevada before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Nevada on November 4, 2015.

342.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEVADA:

(1)    Three times the amount of actual damages that the State of Nevada has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Nevada;

(3)    Prejudgment interest; and

   (4)  All costs incurred in bringing this action.

To RELATOR:

   (1)  The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

   (2)  Reimbursement for reasonable expenses that Relator incurred in connection with this action;

   (3)  An award of reasonable attorneys' fees and costs; and

   (4)  Such further relief as this Court deems equitable and just.

### V.  Count XXII – New Hampshire Medicaid Fraud and False Claims Act

343.  Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

344.  This is a *qui tam* action brought by Relator and the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et. seq.*

345.  N.H. Rev. Stat. Ann. §167:61-b(I) provides liability for any person who-

   (a)  Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

   (b)  Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.

   (c)  Conspires to defraud the department by getting a false or fraudulent claim allowed or paid.

   ***

   (e)  Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the department.

346.     The Defendants have knowingly violated N.H. Rev. Stat. Ann. §167:61-b(I) by violating the Federal Anti-Kickback Statute as described herein.

347.     As a result of the Defendants' pricing schemes, all of the claims for Enoxaparin that the Defendants caused their retail pharmacy customers to knowingly submit to the New Hampshire Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the New Hampshire Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

348.     The State of New Hampshire, by and through the New Hampshire Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

349.     Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of New Hampshire's payment decision.

350.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of New Hampshire's loss, and a consequence of the scheme.

351.     As a result of the Defendants' violations of N.H. Rev. Stat. Ann. §167:61(I), the State of New Hampshire has been damaged.

352.    There are no bars to recovery under N.H. Rev. Stat. Ann. § 167:61-e(III)(d), or in the alternative, Relator is an original source as defined in N.H. Rev. Stat. Ann. § 167:61-bV(c). Relator is an individual with direct and independent knowledge of the information on which these allegations are based, and he has brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-c on behalf of himself and on behalf of the State of New Hampshire. Relator has voluntarily provided the information herein to the State of New Hampshire before filing an action under RSA 167:61-c based on that information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of New Hampshire on November 4, 2015.

353.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of New Hampshire.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW HAMPSHIRE:

(1)    Three times the amount of actual damages that the State of New Hampshire has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of New Hampshire;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to N.H. Rev. Stat. Ann. §167:61-e and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**W.     Count XXIII – New Jersey False Claims Act**

354.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

355.    This is a *qui tam* action brought by Relator and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C *et seq*.

356.    N.J. Stat. Ann. § 2A:32C-3 provides liability for any person who-

(a)     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

        ***

(g)     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

357.    The Defendants have knowingly violated N.J. Stat. Ann. § 2A:32C-3 by violating the Federal Anti-Kickback Statute, as described herein.

358.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the New Jersey

102

Medicaid program are false or fraudulent.  Additionally, the Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the New Jersey Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, the Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

359.    The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

360.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of New Jersey's payment decision.

361.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of New Jersey's loss, and a consequence of the scheme.

362.    As a result of the Defendants' violations of N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey has been damaged.

363.    There are no bars to recovery under N.J. Stat. Ann. § 2A:32C-9(c), or in the alternative, Relator is an original source as defined therein.  Relator is an individual with direct and independent knowledge of the allegations herein. Furthermore, Relator has voluntarily provided the information underlying these allegations to the State of New Jersey prior to bringing this action on behalf of himself and on behalf of the State of New Jersey pursuant to

N.J. Stat. Ann. § 2A:32C-5(b). Relator submitted a pre-filing disclosure and referenced exhibits

to the Attorney General of the State of New Jersey on November 4, 2015.

364.    This Court is requested to accept pendent jurisdiction of this related state claim as

it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage

to the State of New Jersey.

WHEREFORE, Relator respectfully requests this Court to award the following damages

to the following parties and against the Defendants:

To the STATE OF NEW JERSEY:

(1)    Three times the amount of actual damages that the State of New Jersey has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of New Jersey;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to N.J. Stat. Ann. § 2A:32C-7 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## X.    Count XXIV – New Mexico Medicaid False Claims Act

365.    Relator realleges and hereby incorporates by reference each and every allegation

contained in all paragraphs of this Original Complaint.

366.    This is a *qui tam* action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*. and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq*.

367.    N.M. Stat. Ann. § 27-14-4 provides liability for any person who-

(A)    Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

***

(C)    Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

(D)    Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent;

(E)    Makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false;

368.    N.M. Stat. Ann. § 44-9-3(A) provides that a person shall not-

(1)    Knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee or other recipient of state or political subdivision funds a false or fraudulent claim for payment or approval;

(2)    Knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3)    Conspire to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim;

(4)    Conspire to make, use or cause to be made or used, a false,

> misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision;
>
> ***
>
> (8)   Knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

N.M. Stat. Ann. § 44-9-3(B) provides that proof of specific intent to defraud is not required for a violation of § 44-9-3(A).

369.    The Defendants have knowingly violated N.M. Stat. Ann. § 27-14-4 and N.M. Stat. Ann. § 44-9-3 by violating the Federal Anti-Kickback Statute and the New Mexico Anti-Kickback Statute (N.M. Stat Ann. § 30-44-7), as described herein.

370.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the New Mexico Medicaid program are false or fraudulent, regardless of whether there is proof of specific intent to defraud.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the New Mexico Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.   Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the New Mexico Anti-Kickback Statute (N.M. Stat Ann. § 30-44-7). Compliance with federal and state laws and regulations were conditions of payment.

371.    The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

372.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of New Mexico's payment decision.

373.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of New Mexico's loss, and a consequence of the scheme.

374.    As a result of Defendants' violations of N.M. Stat. Ann. § 27-14-4 and N.M. Stat. Ann. § 44-9-3, the State of New Mexico has been damaged.

375.    There are no bars to recovery under N.M. Stat. Ann. § 27-14-10(C), or in the alternative, Relator is an original source as defined therein. Relator possesses independent knowledge of Defendants' schemes, and his knowledge is based on his own investigation of Defendants' conduct. Relator has voluntarily provided the information on which the allegations are based to the State of New Mexico prior to bringing this action on behalf of himself and on behalf of the State of New Mexico. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of New Mexico on November 4, 2015.

376.    This Court is requested to accept pendent jurisdiction of these related state claims as they are predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of New Mexico.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW MEXICO:

(1)    Three times the amount of actual damages that the State of New Mexico has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of New Mexico;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to N.M. Stat. Ann. § 27-14-9, N.M. Stat. Ann. § 44-9-7, and any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**Y.    Count XXV – New York False Claims Act**

377.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

378.    This is a *qui tam* action brought by Relator and State of New York to recover treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law §§ 187 - 194.

379.    N.Y. State Fin. Law § 189(1) provides liability for any person who-

    (a)    Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

    (b)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    ***

    (c)    Conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

    ***

     (g)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

     (h)     Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same.

380.    The Defendants have knowingly violated N.Y. State Fin. Law § 189(1) by violating the Federal Anti-Kickback Statute, as described herein.

381.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the New York Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the New York Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

382.    The State of New York, by and through the State of New York Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

383.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of New York's payment decision.

384.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of New York's loss, and a consequence of the scheme.

385.    As a result of the Defendants' violations of N.Y. State Fin. Law § 189, the State of New York has been damaged.

386.    There are no bars to recovery under N.Y. State Fin. Law. § 190(9), and, or in the alternative, Relator is an original source as defined in § 188(7).   Relator has independent knowledge of the information supporting these allegations and has voluntarily disclosed the information on which his allegations are based prior to prior to bringing this action on behalf of himself and on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2). Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of New York on November 4, 2015.

387.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of New York.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW YORK:

(1)    Three times the amount of actual damages that the State of New York has sustained as a result of the fraudulent and illegal practices of Defendants;

(2)    A civil penalty of not less than $6,000 and not more than $12,000 for each false claim that Defendants presented or caused to be presented to the State of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relator:

      (1)      The maximum amount allowed pursuant to N.Y. State. Fin. Law § 190(6) and/or any other applicable provision of law;

      (2)      Reimbursement for reasonable expenses that Relator incurred in connection with this action;

      (3)      An award of reasonable attorneys' fees and costs; and

      (4)      Such further relief as this Court deems equitable and just.

**Z.      Count XXVI – North Carolina False Claims Act**

388.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

389.    This is a *qui tam* action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

390.    N.C. Gen. Stat. § 1-607(a) provides liability for any person who

      (1)      Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

      (2)      Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

      (3)      Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

      ***

      (7)      Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

391.    Defendants have knowingly violated N.C. Gen. Stat. § 1-607 by violating the Federal Anti-Kickback Statute, as described herein.

392.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the North Carolina Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the North Carolina Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program. Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

393.    The State of North Carolina, by and through the North Carolina Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

394.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of North Carolina's payment decision.

395.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of North Carolina's loss, and a consequence of the scheme.

396.    As a result of Defendants' violations of N.C. Gen. Stat. § 1-607, the State of North Carolina has been damaged.

397.    There are no bars to recovery under N.C. Gen. Stat. § 1-611, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of North Carolina on November 4, 2015.

398.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of North Carolina.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages that the State of North Carolina has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of North Carolina;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to N.C. Gen. Stat. § 1-610 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

AA.    **Count XXVII – Oklahoma Medicaid False Claims Act**

399.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

400.    This is a *qui tam* action brought by Relator and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. 63 § 5053 *et seq*.

401.    Okla. Sta. Ann. 63 § 5053.1(B) provides liability for any person who-

      1.    Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

      2.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

      3.    Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

      ***

      7.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.

402.    Defendants have knowingly violated Okla. Stat. Ann. 63 § 5053.1(B) by violating the Federal Anti-Kickback Statute and the Oklahoma Anti-Kickback Statute (Okla. Stat. Ann. 56 § 1005), as described herein.

403.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Oklahoma Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Oklahoma Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to

114

pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Oklahoma Anti-Kickback Statute (Okla. Stat. Ann. 56 § 1005).  Compliance with federal and state laws and regulations were conditions of payment.

404.   The State of Oklahoma, by and through the Oklahoma Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

405.   Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Oklahoma's payment decision.

406.   The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Oklahoma's loss, and a consequence of the scheme.

407.   As a result of Defendants' violations of Okla. Stat. Ann. 63 § 5053.1(B), the State of Oklahoma has been damaged.

408.   There are no bars to recovery under Okla. Stat. Ann. 63 § 5053.5, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Oklahoma pursuant to Okla. Stat. Ann. 63 § 5053.2. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Oklahoma before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Oklahoma on November 4, 2015.

409.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Oklahoma.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF OKLAHOMA:

    (1)    Three times the amount of actual damages that the State of Oklahoma has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Oklahoma;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to Okla. Stat. Ann. 63 § 5053.4, and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**BB.     Count XXVIII – Rhode Island State False Claims Act**

410.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

411.     This is a *qui tam* action brought by Relator and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.

412.     R.I. Gen. Laws § 9-1.1-3 provides liability for any person who-

(1)     Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)     Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7);

\*\*\*

(7)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

413.     The Defendants have knowingly violated R.I. Gen. Laws § 9-1.1-3 by violating the Anti-Kickback Statute and the Rhode Island Anti-Kickback Statutes (R.I. Gen Laws § 5-48.1-3 and § 40-8.2-3), as described herein.

414.     As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Rhode Island Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Rhode Island Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute and the Rhode Island Anti-Kickback Statutes (R.I. Gen Laws § 5-48.1-3 and § 40-8.2-3).  Compliance with federal and state laws and regulations were conditions of payment.

117

415.     The State of Rhode Island, by and through the Rhode Island Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

416.     Given the structure of the health care systems, the false statements, representations, and/or records made by Defendants had the potential to influence the State of Rhode Island's payment decision.

417.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Rhode Island's loss, and a consequence of the scheme.

418.     As a result of Defendants' violations of R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island has been damaged.

419.     There are no bars to recovery under R.I. Gen. Laws § 9-1.1-4(e), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Rhode Island prior to filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Rhode Island on November 4, 2015.

420.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Rhode Island.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF RHODE ISLAND:

(1)     Three times the amount of actual damages that the State of Rhode Island has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Rhode Island;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**CC.    Count XXIX – Tennessee Medicaid False Claims Act**

421.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

422.    This is a *qui tam* action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

423.    Tenn. Code Ann. § 71-5-182(a)(1) provides liability for any person who-

(A)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

(B)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program;

(C)     Conspires to commit a violation of subsection (A), (B), or (D); or

119

(D)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program.

424.    Defendants knowingly violated Tenn. Code Ann. § 71-5-182(a)(1) by violating the Anti-Kickback Statute, as described herein.

425.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Tennessee Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Tennessee Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

426.    The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

427.    Given the structure of the health care systems, the false statements, representations, and/or records made by Defendants had the potential to influence the State of Tennessee's payment decision.

428.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of Tennessee's loss, and a consequence of the scheme.

429.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged.

430.    There are no bars to recovery under Tenn. Code Ann. § 71-5-183(e)(2), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b)(1). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Tennessee before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Tennessee on November 4, 2015.

431.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Tennessee.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

(1)    Three times the amount of actual damages that the State of Tennessee has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,000 and not more than $25,000 for each false claim that Defendants presented or caused to be presented to the State of Tennessee;

(3)    Prejudgment interest; and

(4)     All costs incurred in bringing this action.

TO RELATOR:

(1)     The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**DD.     Count XXX – Vermont False Claims Act**

432.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

433.     This is a *qui tam* action brought by Relator and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. 32 § 630 *et seq*.

434.     Vt. Stat. Ann. 32 § 631(a) provides that no person shall-

(1)     Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2)     Knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

(3)     Knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;

(4)     Knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment

122

under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program" ), due to a violation of 42 U.S.C. § 1395nn;

\*\*\*

(9)     Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;

(10)    Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

\*\*\*

(12)    Conspire to commit a violation of this subsection.

435.    Defendants have knowingly violated Vt. Stat. Ann. 32 § 631(a) by violating the Federal Anti-Kickback Statute, as described herein.

436.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Vermont Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Vermont Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

437.    The State of Vermont, by and through the Vermont Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

123

438.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Vermont's payment decision.

439.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the State of Vermont's loss, and a consequence of the scheme.

440.    As a result of Defendants' violations of Vt. Stat. Ann. 32 § 631(a), the State of Vermont has been damaged.

441.    There are no bars to recovery under Vt. Stat. Ann. 32 § 636, or in the alternative, Relator is an original source as defined in Vt. Stat. Ann. 32 § 630(5).  Relator has brought this action on his own behalf and on behalf of the State of Vermont pursuant to Vt. Stat. Ann. 32 § 632. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Vermont before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Vermont on November 4, 2015.

442.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Vermont.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF VERMONT:

(1)    Three times the amount of actual damages that the State of Vermont has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Vermont;

    (3)     Prejudgment interest; and

    (4)     All costs incurred in bringing this action.

To RELATOR:

    (1)     The maximum amount allowed pursuant to Vt. Stat. Ann. 32 § 635 and/or any other applicable provision of law;

    (2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)     An award of reasonable attorneys' fees and costs; and

    (4)     Such further relief as this Court deems equitable and just.

**EE.   Count XXXI – Virginia Fraud Against Taxpayers Act**

443.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

444.    This is a *qui tam* action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*

445.    Va. Code § 8.01-216.3 provides liability for any person who-

    1.     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    2.     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    3.     Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;

    ***

    7.     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or

125

knowingly and improperly avoids or decreases an obligation to pay
or transmit money or property to the Commonwealth.

446.    Defendants have knowingly violated Va. Code § 8.01-216.3 by violating the

Federal Anti-Kickback Statute and the Virginia Anti-Kickback Statute (Va. Code Ann. § 32.1-

315), as described herein.

447.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that

Defendants caused their retail pharmacy customers to knowingly submit to the Commonwealth

of Virginia's Medicaid program are false or fraudulent.  Additionally, Defendants reduced their

rebate liability to the Commonwealth by not reporting the correct AWP or WAC to the

Commonwealth of Virginia's Medicaid program, and thus knowingly made false records or

statements to conceal, avoid, or decrease an obligation to pay money to the Commonwealth of

Virginia's Medicaid program.  Further, Defendants caused these retail pharmacies to falsely

certify, expressly and/or impliedly, and represent full compliance with all federal and state laws

and regulations prohibiting fraudulent acts and false reporting, including but not limited to the

Anti-Kickback Statute and the Commonwealth of Virginia's Anti-Kickback Statute (Va. Code

Ann. § 32.1-315).  Compliance with federal and state laws and regulations were conditions of

payment.

448.    The Commonwealth of Virginia, by and through the Commonwealth of Virginia

Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

449.    Given the structure of the health care systems, the false statements,

representations, and/or records made by the Defendants had the potential to influence the

Commonwealth of Virginia's payment decision.

450.     The ultimate submission by the retail pharmacies of false claims to the state Medicaid programs was a foreseeable factor in the Commonwealth of Virginia's loss, and a consequence of the scheme.

451.     As a result of the Defendants' violations of Va. Code Ann. § 8.01-216.3, the Commonwealth of Virginia has been damaged.

452.     There are no bars to recovery under Va. Code Ann. § 8.01-216.8, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the Commonwealth of Virginia before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the Commonwealth of Virginia on November 4, 2015.

453.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the Commonwealth of Virginia.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the COMMONWEALTH OF VIRGINIA:

(1)     Three times the amount of actual damages that the Commonwealth of Virginia has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the Commonwealth of Virginia;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**FF.    Count XXXII – Washington State Medicaid Fraud False Claims Act**

454.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

455.    This is a *qui tam* action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq.*

456.    Wash. Rev. Code § 74.66.020(1) provides liability for any person who-

    a.    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    b.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    c.    Conspires to commit one or more of the violations in this subsection (1);

    ***

    g.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

457.    Defendants have knowingly violated Wash. Rev. Code § 74.66.020(1) by violating the Federal Anti-Kickback Statute, as described herein.

458.    As a result of Defendants' pricing schemes, all of the claims for Enoxaparin that Defendants caused their retail pharmacy customers to knowingly submit to the Washington Medicaid program are false or fraudulent.  Additionally, Defendants reduced their rebate liability to the state by not reporting the correct AWP or WAC to the Washington Medicaid program, and thus knowingly made false records or statements to conceal, avoid, or decrease an obligation to pay money to the state Medicaid program.  Further, Defendants caused these retail pharmacies to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute.  Compliance with federal and state laws and regulations were conditions of payment.

459.    The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

460.    Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Washington's payment decision.

461.    The ultimate submission by the retail pharmacies of false claims to the state Medicaid program was a foreseeable factor in the State of Washington's loss, and a consequence of the scheme.

462.    As a result of the Defendants' violations of Wash. Rev. Code § 74.66.020(1), the State of Washington has been damaged.

463.    There are no bars to recovery under Wash. Rev. Code § 74.66.080, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Washington before filing an action based on the information. Relator submitted a pre-filing disclosure and referenced exhibits to the Attorney General of the State of Washington on November 4, 2015.

464.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Washington.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF WASHINGTON:

(1)    Three times the amount of actual damages that the State of Washington has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Washington;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to Wash. Rev. Code § 74.66.070 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

465.    (4)     Such further relief as this Court deems equitable and just.

**GG.    Count XXXIII – Common Fund Relief**

466.    Relator realleges and hereby incorporates by reference each and every allegation

contained in all paragraphs of this Original Complaint.

467.    While the states possessing *qui tam* statutes have a regulatory scheme for

rewarding Relator for coming forward, those that have none will potentially receive a windfall

with little or no investigation or commitment of time or resources to the recovery.  The common-

fund doctrine preserves the right of the litigant or counsel to an award from the common fund

generated.  The United States Supreme Court and many other courts have addressed this remedy.

*Boeing Company v. Van Gemert*, 444 U.S. 472, 478 (1980):

> Since the decisions in *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157
> (1882), and *Central Railroad & Banking Co. v. Pettuss*, 113 U.S. 116, 5 S.Ct.
> 387, 28 L.Ed. 915 (1885), this Court has recognized consistently that a litigant or
> a lawyer who recovers a common fund for the benefit of persons other than
> himself or his client is entitled to a reasonable attorney's fee from the fund as a
> whole. [citations omitted].  The common-fund doctrine reflects the traditional
> practice in courts of equity, *Trustees v. Greenough*, supra 105 U.S., at 532-537,
> and it stands as a well-recognized exception to the general principle that requires
> every litigant to bear his own attorney's fees [citations omitted].  The doctrine
> rests upon the perception that persons who obtain the benefit of the lawsuit
> without contributing to its cost are unjustly enriched at the successful litigant's
> expense [citation omitted].  Jurisdiction over the fund involved in the litigation
> allows a court to prevent this inequity by assessing attorney's fees against the
> entire fund, thus spreading fees proportionally among those benefitted by this suit.
> [citations omitted].

468.    Other courts have also recognized the common fund doctrine for situations such

as those that may arise in this case.  *See e.g., In re Smithkline Beckman Corp. Securities Litig.*,

751 F. Supp. 525, 531 (E.D. Pa. 1990) (citing *Boeing* in support of decision to award common

fund relief); *see also* "The Common Fund Doctrine: Coming of Age in the Law of Insurance

Subrogation," 31 Ind. L. Rev. 313, 337–38 (1998). Relator respectfully requests this Court to award him a percentage share from the common fund generated by his actions.

## XII. SIZE OF RECOVERY

469. The Defendants defrauded the federal and state governments of an amount to be determined. Relator estimates that the United States and the States have suffered millions of dollars in damages, but Relator will supplement his estimate of damages.

## XIII. DOCUMENTARY EVIDENCE

470. At present, the documentary evidence in this case consists of the exhibits listed below.

| EXHIBIT NO. | DESCRIPTION | BATES RANGE |
|---|---|---|
| 1 | Medicaid Prescription Reimbursement Information by State—Quarter Ending June 2015 | AR000001 – 8 |
| 2 | McKesson Wholesaler Pricing Catalog for Enoxaparin | AR000009 |
| 3 | AmerisourceBergen Wholesaler Pricing Catalog for Enoxaparin | AR000010 – 12 |
| 4 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 30mg/0.3ml (NDC 62037-0839-20) | AR000013 – 14 |
| 5 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 40mg/0.4ml (NDC 62037-0849-20) | AR000015 – 16 |
| 6 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 60mg/0.6ml (NDC 62037-0861-20) | AR000017 – 18 |
| 7 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 80mg/ml (NDC 62037-0862-20) | AR000019 – 20 |
| 8 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 100mg (NDC 62037-0863-20) | AR000021 – 22 |
| 9 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 120mg (NDC 62037-0864-20) | AR000023 – 24 |
| 10 | Screen Shot from Target's Computer Showing Target's Acquisition Cost for Actavis/Amphastar's Enoxaparin 150mg (NDC 62037-0866-20) | AR000025 |

| 11 | Screen Shot from Target's Computer Showing NDC Numbers for Actavis/Amphastar's Enoxaparin NDCs | AR000026 – 27 |
|----|----|----|
| 12 | Chart Summarizing Actavis/Amphastar Spread Calculations | AR000028 – 29 |
| 13 | Chart Summarizing Sandoz Spread Calculations | AR000030 – 31 |
| 14 | Chart Summarizing Teva Spread Calculations Based on Pricing Offered Through McKesson | AR000032 – 33 |
| 15 | Chart Summarizing Teva Spread Calculations Based on Pricing Offered Through AmerisourceBergen | AR000034 – 35 |
| 16 | Chart Summarizing Winthrop Spread Calculations | AR000036 – 37 |
| 17 | Screen Shot from New York Pharmacy Showing Claim for Sandoz's Enoxaparin 100mg (NDC 00781-3500-69) Submitted to New York Medicaid for Reimbursement | AR000038 |
| 18 | List of New York Medicaid Managed Care Organizations and Group Identification Numbers | AR000039 |
| 19 | Screen Shot from Target's Computer Showing Claim for Actavis/Amphastar's Enoxaparin 60mg/0.6ml (NDC 62037-0861-20) Submitted to TRICARE for Reimbursement | AR000040 – 41 |
| 20 | Target "Controlled Drug Detail Report" for Patients Filling Enoxaparin Prescriptions in Virginia with Relator's Handwritten Notes | AR000042 – 48 |
| 21 | Screen Shot from Target's Computer Showing Claim for Actavis/Amphastar's Enoxaparin 80mg/ml (NDC 62037-0862-20) Submitted to Virginia Medicaid Managed Care Plan for Reimbursement | AR000049 – 50 |
| 22 | Screen Shot from Target's Computer Showing Quantity of Actavis/Amphastar's Enoxaparin 80mg/ml (NDC 62037-0862-20) Dispensed to Virginia Medicaid Patient for Claim at Exhibit 21 | AR000051 |
| 23 | Screen Shot from Relator's Computer Showing Claim for Winthrop's Enoxaparin 120mg (NDC 00955-1012-10) Submitted to a Medicare Part D Plan for Reimbursement | AR000052 – 53 |

## XIV.  DEMAND FOR JURY TRIAL

471.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,

BERG & ANDROPHY

/s/*Joel M. Androphy*
Joel M. Androphy
State Bar No. 01254700
Janis G. Gorton
State Bar No. 24071063
Berg & Androphy
Zenobia Harris Bivens
State Bar No. 24065378
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2015, a true and correct copy of this Original Complaint and the exhibits referenced herein were forwarded via the United States Mail, certified, return receipt requested, to the United States Attorney's Office, the Department of Justice in Washington, D.C., and the Attorneys General of the Qui Tam States and the District of Columbia.

/s/*Joel M. Androphy*